John M'Learn and others, aliens and subjects of the King of Great Britain, appellants v. James Wallace, a citizen of the State of Georgia, administrator of James Hendley M'Learn, and Archibald M'Lellan and wife, citizens of the State of South Carolina.

Archibald M'Lellan and wife, citizens of the State of South Carolina, complainants v. James Wallace, a citizen of the State of Georgia, administrator of James Hendley M'Learn deceased.

James Wallace, a citizen of the State of Georgia, administrator of James Hendley M'Learn deceased v. Archibald M'Lellan and wife, citizens of the State of South Carolina, and John M'Learn and others, aliens and subjects of the King of Great Britain.

A tract of land in the state of Georgia was purchased by A. M'Learn, on which he established a rice plantation, put slaves upon it, paid part of the purchase money, gave a judgment for the balance, and died, leaving a son, James H. M'Learn, his devisee; who, to obtain possession of the estate, mortgaged the land and slaves for the balance of the judgment. A judgment, under the laws of Georgia, binds personal as well as real property. The son died, part of the debt being unsatisfied: leaving as his nearest of kin, aliens ; and also more remote kindred ; who were citizens of the United States. The real estate was sold to satisfy, and did satisfy the mortgage. The personal estate was sold by the executor. The aliens, who were nearest of kin, claimed the proceeds of the personal estate. The kindred of the deceased who were more remote, but who were citizens of the United States, claimed that the personal estate should have been appropriated to pay the mortgage ; and that not having been so appropriated, they were entitled to the money arising from its sale, to reimburse them for the value of the real estate taken by the mortgagor, the aliens nearest of kin not being entitled by the law of Georgia to take real estate by descent. The court held, that as both the real and personal estate had been charged with the mortgage debt, both funds must be applied, in proportion to their respective amounts, to its payment. Any debt, not covered by the mortgage, to be paid out of the personal estate. The nearest of kin to take the residue of the proceeds of the personal estate, and the remoter kin, citizens of the United States, to take the residue of the proceeds of the real estate, and the real estate unsold.

APPEAL from the circuit court of the United States for the district of Georgia.

[M'Learn v. M'Lellan.]

Archibald M'Learn, a native of Scotland, and afterwards a citizen of the United States, purchased a tract of land called Gowrie, and a small island, in Chatham county, in the state of Georgia, on which he established a rice plantation ; and having paid part of the purchase money, a judgment was obtained against him for the balance. He died, having devised the whole of his estate, real and personal, to his son, James H. M'Learn. The property of the testator consisted, chiefly, of the plantation in Chatham county, and the negroes by which it was cultivated. By the laws of Georgia, all the property of the testator, both real and personal, was bound by the judgment against Archibald M'Learn.

James H. M'Learn, holding under the will of his father Archibald M'Learn, the whole of his estate, thus incumbered by the judgment for the balance of the purchase money due for the land, in order to obtain possession from the executors of the will, who insisted on keeping possession until the debts due by the testator were paid ; gave to the creditor of his father his bond for the unpaid balance of the purchase money, and executed a mortgage to secure the payment of the bond, on the land, and on the negroes belonging to the estate. He paid a part of the debt, and died without issue, and intestate ; leaving a balance of the original debt for the purchase money unpaid, and secured by the bond and mortgage.

The mortgagee foreclosed the mortgage, and sold the land for 19,739 dollars 13 cents : thus satisfying the whole of the claims of the creditors of Archibald M'Learn and James H. M'Learn, for the original purchase money of the real estate, and for the interest on the same.

James Wallace administered to the estate of James H. M'Learn, sold all the personal property, and after paying all the remaining debts of his intestate, there was a balance in his hands, in 1833, exceeding 21,000 dollars; which he invested, by agreement of all interested, for the benefit of whoever might be entitled to the same.

The nearest of kin to James H. M'Learn, were John M'Learn and others, who were aliens, residing, at the time of the decease of the said James H. M'Learn, in Great Britain, and were subjects of the king of that kingdom.

The wife of Archibald M'Lellan was more remotely related in blood to the intestate, and she and her husband were citizens of the state of South Carolina, at the time of his decease ; and she was the nearest of kin to him, capable of inheriting his real estate, accord-

[M'Learn v. M'Lellan.]

ing to the laws of Georgia, which do not allow aliens to inherit land. As the next of kin capable of inheriting, they claimed the real estate of James H. M'Learn.

John M'Learn and wife, and the aliens nearest of kin to the intestate, filed a bill in the circuit court of the United States for the district of Georgia, against James Wallace, administrator of James H. M'Learn, and against Archibald M'Lellan and wife, the remoter kindred of the intestate, citizens of South Carolina. The bill prayed that the complainants should be declared entitled to the estate, real and personal, of James Hendley M'Learn; that the same should be delivered to them, and the cash in the hands of the administrator should be paid to them. The bill also prayed, that Archibald M'Lellan and wife should be decreed to have no interest in the real estate; and for other and farther relief.

Archibald M'Lellan and wife filed a bill in the same court against John M'Learn and others, the alien kindred of the intestate, and against James Wallace, his administrator. The bill prayed that the complainants may be declared entitled to so much of the real estate of James H. M'Learn, as remained unsold; that the alien kindred of the said James should be decreed to have no interest in the lands; and that the administrator should be decreed to account to them for the whole of the personal estate remaining after the payment of the debts of his intestate; and to account to them for the amount of the sales of the land, and to pay to them the value of the said land sold, out of the proceeds of the personal estate remaining unadministered, and for other and further relief, &c.

James Wallace, the administrator of James H. M'Learn, filed his bill of interpleader, claiming the protection of the court, exhibiting an account; and offering to deliver the unadministered part of the estate to such party as the court may adjudge to be entitled to receive it.

The circuit court decreed that Archibald M'Lellan and wife, as the nearest of kin to James H. M'Learn, capable under the laws of the state of Georgia, of inheriting real estate; they being citizens of the United States at the time of his decase; were entitled to the whole of the real estate of which James H. M'Learn died seised and possessed; but the same having been sold, the court allowed them the money for the part sold, and all the real estate unsold: and to John M'Learn and the aliens, the court allowed the remaining part of the estate, after the payment to Archibald M'Lellan and wife of the sum of 19,739 dollars 13 cents, the amount the plantation sold for, less

[M'Learn v. M'Lellan.]

the costs of suit, &c.   The sum decreed to be paid to John M'Learn and wife amounted to 1557 dollars 35 cents.   The administrator, James Wallace, was decreed to pay those sums to the parties respectively, and to deliver the title deeds, &c.

From these decrees, John M'Learn and others, aliens, appealed to this court.

The case was submitted to the court, on the part of the appellants, by Mr Berrien, on a printed argument, handed to the court by Mr White; and was argued at the bar by Mr Preston, for Archibald M'Lellan and wife.

Certificates from gentlemen of distinguished legal acquirements, and many of whom had held high judicial stations in the state of Georgia, were laid before the court in support of the construction given by the counsel for the appellants, of the laws of Georgia ; and the application thereof in cases of intestacy in the courts of that state.

Mr Berrien contended :

1. That the debts of an intestate, whether by simple contract or by specialty, are chargeable equally on his real estate and personal estate in Georgia.   The law of England, which declares the latter to be the primary fund for that purpose, and marshals the assets to enforce that liability, by the exoneration of the real estate, is not the law of Georgia.

2. Even in England, the debt for which the land was sold, under the mortgage given by James H. M'Learn; having been contracted by Archibald M'Learn, and being for the unpaid purchase money of the same land ; such debt, notwithstanding the bond and mortgage given by James H. M'Learn, ought, as between his representatives, to be charged on the land.

3. In the worst aspect of the case, the personal estate could only be liable to contribution.

4. In any event the commissions on the sales of the land, cannot be charged to the personal estate.

The printed argument of Mr Berrien was prefaced by the following " preliminary remarks."

"The degrees of kindred of the respective parties are not in controversy—neither is the account of the administrator ; but there is one question, to which the attention of the court is called, before entering into the general argument ; because if decided in favour of the

[M'Learn v. M'Lellan.]

complainants in the first bill, it disposes of the whole case. It is, whether those complainants, although aliens, and therefore incapable under the laws of Georgia, of holding the real estate specifically, are not, under those laws, entitled to its proceeds.

"Prince's Dig. 135, art. 15.

"Although aliens are incapable of holding lands, they are entitled by this act to take the proceeds of real estate, as devisees, or next of kin, of a deceased citizen. It recites that vexatious lawsuits had been prosecuted by the escheators against the estates of citizens, who had bequeathed their estates to persons residing in foreign parts, and provides that their lands may be sold, and the proceeds paid over. The words of the recital are confined to persons dying testate, citizens who bequeathed their estates; but the enacting clause applies also, to cases of intestacy, for it authorizes the executor, or administrator, to sell such real estate, and pay over the proceeds to the devisees, or legal representatives of the deceased. It authorizes this, however, only where the citizens shall die, leaving no heir who can inherit the same, because of his being an alien ; and the argument, against which we have to contend is, that when any of the kindred of the deceased, however remote, are citizens, their claims, as to the real estate, will prevail over those of the devisees, or nearest of kin, being aliens. Such is the letter of the act, the words being, ' shall leave no heir, &c. &c.' Sed qui hæret in litera, hæret in cortice. Its manifest intention is, to remove the disability of alienage, from the next of kin, or devise of a citizen; and these words, ' shall leave no heir, &c. &c.' may, without any extravagance of version, be construed as equivalent to a provision in the following words: 'shall leave next of kin, or devise to persons who are incapable of taking because of their being aliens.' It was the design of the legislature to permit a citizen to leave his real estate to the natural, or selected objects of his bounty ; not specifically, for that the policy of the law was supposed to forbid, but by a sale and delivery of the proceeds.

"This view is confirmed by the act of 1789, which declares, that ' should any case arise which is not expressly provided for by this act, respecting intestate's estates, the same shall be referred to, and determined by the common law of the land, as it hath stood, since the first settlement of this state, except, only, that real and personal property shall always be considered, in respect to such distribution, as being precisely on the same footing.' Now here is a case of distribution of an intestate's estate, not expressly provided for by that act ;

and according to the argument we are contesting, the real and personal estate would be disposed of in a different manner. But the act itself declares, that the common law, modified by its own express provisions, shall constitute the rule. The common law inhibits an alien from holding real estate, but permits him to hold personalty. This act provides that these two species of estates shall be precisely on the same footing in respect to distribution. How are these conflicting provisions to be reconciled? Must the disability of alienage, which the common law confines to the realty, be extended to the personal estate; or shall the privilege of holding personalty, be extended to the real estate? It is only in one of these two modes that the requirement of the act of 1789, that real and personal estate shall be in respect to distribution, precisely on the same footing, can be complied with; unless by a liberal interpretation of the act of 1810, (Prince 135) the claim of the alien to take the proceeds of the estate, is admitted."

1. Upon the first point it was contended, that the course of legislation in Georgia, had been, uniformly, to put real and personal estate on the same footing for the payment of debts, as well as for other various purposes. The doctrine of the common law of England, which gives land to the heir, and chattels to the executor or administrator, has never been recognized in the state. Both species of property pass under the laws directly to the executor or administrator, to be applied by him as assets in payment of debts; or for distribution among the next of kin of equal degree.

No person is known, under the laws of Georgia, as heir, in contradistinction to the distributees of a decedent, as they are identical; unless in such a case as this now before the court, where it is said the disability of alienage intervenes to incapacitate the nearest of kin from taking the real estate. But in this case, the more remote kindred must sustain their claim, if it may be sustained, under the statute of distributions of Georgia; and do not take by descent at common law.

In support of these positions, he cited, Wat. Dig. 15, 29, 313, 414; Prince's Dig. 559, art. 160; Prince's Dig. 160, art. 42.

The courts of Georgia have given effect to the provisions of the constitution and laws of Georgia, which have been cited; and have rejected the distinction which exists under the law of England between the heir of the real, and distributee or representative of the personal estate; and with it the power which is exercised by the

English courts of chancery, of marshalling the assets of a decedent's estate, as between these parties.

By the laws of Georgia, lands as well as chattels may be taken in execution, and sold in precisely the same manner. The former are assets for the payment of debts in the hands of an executor or administrator, primarily or equally with the personal estate; and without any proceeding against the heir to render them so. That such is the law of Georgia, was recognized by this court in the case of Telfair v. Stead's Executors, 2 Cranch 406, 1 Peters's Cond. Rep. 211; cited also, Prince's Dig. 211, 212, art. 12; Dawson's Dig. 216; Dawson's Dig. 595; Prince's Dig. 158, art. 29.

The common and statute law of Great Britain, which were " usually in force in the province of Georgia, in May 1776," and not contrary to the constitution, laws and form of the government of the state; were declared to be in force, " until repealed, amended or otherwise altered."

It is necessary then, that M'Lellan and wife, who seek to enforce what they conceive to be the English rule in this case, should show, affirmatively, that it was usually in force in Georgia in 1776; and negatively, that it has not been since repealed, amended or otherwise altered: which is believed to be impossible. The onus is with them. But if this were not so, it seems very clear, that our own legislation, and the decisions of our courts, will show, affirmatively, that it is not the law of Georgia.

The whole course and spirit and purpose of the laws and decisions of the courts of Georgia, have been in opposition to the rights which, in England, form the policy which there prevails in favour of the heir. The law of descents of Georgia is different. The right of creditors to enforce the payment of their debts is different; and the marshalling of the assets of a decedent's estate is fixed and regulated on dissimilar principles.

2. Will the English rule, which is appealed to in behalf of M'Lellan and wife, sustain their pretensions; the debt which has been paid by the sale of the land, having been originally contracted for the purchase of the same?

Judgment for this debt was recovered against Archibald M'Learn in his lifetime; and by the law of Georgia, it bound all his property, and the plaintiff in the same could have levied for the debt on either the real or personal estate, or on both.

Such was the state of things on the death of Archibald M'Learn.

The judgment remained in full vigour ; was an incumbrance upon his estate, and capable of being enforced against his property, real and personal, in the hands of his executors. James H. M'Learn, who was the general devisee of his father Archibald, on coming of age, in order to obtain possession of the property from the executors, and on their requisition, substituted his bond and mortgage of the land and negroes devised to him by his father, and on which this judgment was an incumbrance.

The only change effected by this was to convert the general lien existing under the judgment, on all the property of Archibald M'Learn, into the specific lien created by the mortgage on the property mortgaged, and to release the remaining property ; which is shown, by the accounts of the administrator, to have been very small, from the lien of the judgment.

Now keeping in mind that this was originally the debt of Archibald M'Learn, contracted by him for the purchase of this very land, which is now claimed by M'Lellan and wife ; and consequently that it did not, as in the case of money taken up on mortgage, enure to the benefit of his personal estate : it is submitted that even upon the principles of equity, applicable to the subject, which are recognised in the English courts of chancery, no one of these circumstances can, nor can all of them combined, throw this debt, exclusively, or primarily, on the personal estate of James H. M'Learn.

We are not now called upon to consider the lien which a vendor has for unpaid purchase money, as against his vendee, or a purchaser from him. The point presented in this case, is between the kindred of the general devisee of the vendee of the land : one claiming the land purchased, the other admitted to be entitled to the personalty ; and both asserting their claims under the statute of distributions of Georgia. As between them, until the purchase money is paid, it remains chargeable in equity on the land purchased. Neither is this a question, whether the general, real or personal estate shall be charged with this debt. The inquiry is more simple. It is whether the specific land purchased, but not paid for, by Archibald M'Learn, shall bear its own burthen ? Whether, upon any principle of equity, M'Lellan and wife can claim this land under the statute of distributions of Georgia, and make the other kindred claiming under the same statute, who have no interest in it, and neither have derived, nor can derive any benefit from it, pay its price ? Cases cited and examined as applicable to this point : Hughes v. Kearney, 1 Sch. &

Lefr. 13; Pollexfen v. Moore, 3 Atk. 236, 272 ; Cumberland v. Coddrington, 3 Johns. Ch. Rep. 252 ; Evelyn v. Evelyn, 2 P. Wms 664; Mathewson v. Hardwick, 2 P. Wms 664, note ; Billingshurst v. Walker, 2 Bro. Ch. Rep. 604; Bassett v. Percival, 2 P. Wms 664, note.

In concluding the argument on this point, it was submitted, that as this debt was originally contracted by Archibald M'Learn, and was a lien upon his property at the time of his death ; and as James H. M'Learn did not, by giving his bond and a mortgage on the same property which was before bound, make this his own debt, so as to throw it upon his personal estate, as between the representatives of James H. M'Learn, it is not a debt exclusively chargeable upon his personal estate, even according to the rule in the English court of chancery.

3. The third point is not presented by the appellants as if this were a case for contribution. It is admitted indeed, that James H. M'Learn, who was the proprietor of the whole estate, had a right to charge any part, or the whole of it, with the payment of this debt ; and that, in point of fact, he has so charged certain real and personal property belonging to the estate by way of mortgage. If the claim of M'Lellan and wife, to be exclusively entitled to the real estate, be sustained ; it will result that real and personal property, subject under the mortgage to a common burthen, has become vested in different persons : but it is also to be remembered, that this incumbrance was created by the purchase of the real property mortgaged ; that the debt, to satisfy which this land was sold, was the unpaid balance of the purchase money of the same land, for which the purchaser and his heirs, however indefinite the series, were but trustees to the vendor, until the purchase money was paid.

As the court gave no opinion on the fourth point, the argument is omitted.

Mr Preston, for the appellees.

The construction given to the law of Georgia, Prince's Digest, 135, art. 15, by the counsel for the appellants, is denied. It is contended that the proceeds of land will, under this law, go to aliens ; although the real estate could not have gone to them after the death of the owner.

The law referred to by the counsel was not intended to remove the disabilities of aliens ; and this is shown in the title and the pur-

pose of it.  It is an act to explain the escheat laws.  It had no view to extend or modify the rights of aliens.  The act of 1810 was intended to explain the act of 1805, and to correct the abuses under it.  The law is construed to extend to cases of testacy; and to put an end to the vexatious acts of the escheators, in those cases.

By the laws of Georgia, as they exist, aliens cannot inherit real estate; the estate is cast by descent on the heritable blood.  The real estate of John H. M'Learn then descended to the appellees; and the real and personal estate should go together.  As they take the real, so they ought to take both.

If this is the law of Georgia, then the appellees, M'Lellan and wife, take all the property of James H. M'Learn, both real and personal: and as the proceeds of the real estate have been absorbed in paying a debt due by, and which ought to have been paid out of the personal estate, the balance in the hands of the administrator should be paid to the appellees.

The circuit court has decided that the balance of the personal estate, after paying the debt for which the real estate was sold, is to go to the nearest of kin.  This is not according to the law of Georgia.

In 1795, aliens were, by the laws of Georgia, allowed to hold real estate by devise; but this act was repealed in the following year. Walker's Dig. 600.  Thus the legislature, by positive enactment, declared their determination that none but citizens of the United States should hold a fee simple estate in lands.

As to the position of the appellant's counsel, that real estate is chargeable equally with personal estate, by the law of Georgia; this is denied.  It is admitted that the whole estate of one deceased is liable for his debts; but the primary fund is the personal property.

Attempts have been made in that state to make them equally liable, but they have not succeeded so as to make them inseparable. The heir-at-law takes the real estate, and the executor takes the personal property; and after the debts are paid, it goes, if they are not aliens, to the personal representatives.  The executors must pay the debts out of the personal assets; and if any construction of the law prevails so as to apply the real estate in equal responsibility with the personal, it is in opposition to the plain meaning of the law.

What is the fixed and settled general law of the state of Georgia cannot be readily ascertained.  It is difficult to obtain reports of the decisions of the courts, and there has been hitherto no court of errors or appeals, having a general and final jurisdiction over cases which

have been decided in the courts of the state. What rights over, and what interests in the real estate of a testator, do executors acquire under the laws of Georgia? Prince's Digest 178.

The law authorizes executors to make titles to lands which the testator, in his lifetime, contracted to sell and convey. If the executors took the lands, they could sell and convey without such a provision, in the same manner as they may sell personal property. The law, however, imposes peculiar solemnities; which must, in cases of sales of lands, be observed by executors. It is therefore apparent that lands are not assets in the hands of an executor. By the law of 1810 it must be admitted, that real property cannot, in case of intestacy, go to an alien. Prince's Digest 156. Can the proceeds of real estate, sold after the decease of the intestate, go to such alien? The law is clearly established, that such proceeds have all the characteristics of the realty, and are governed by the same rules, and subject to the same rights, as the real estate was.

What has an executor to do in Georgia? The law provides only for his care and distribution of the personal estate, and is silent as to the realty. Prince's Dig. 171.

In all the states of the union, personal property is first made applicable to the payment of debts due by a deceased person.

In 2 M'Cord's Chancery cases, it was held, that the English rule prevailed in South Carolina. As between creditors, this was of no moment when they sought to enforce the payment of the debts due to them; but as to all others, the law is different.

The heir is entitled to the profits of the real estate immediately after the death of the person last seised; and the executor takes the personal property. This shows the difference between the rights of persons interested, and the clear distinction between them. The heir holds the land until it is sold; and even in the case of a will giving executors power to sell land, no title to it is given; and the heirs continue in possession until the sale.

Mr Justice Wayne stated, that in Georgia executors never sell land for payment of debts, but by order of court. The same law prevails in Georgia as in other states.

The common law of England is in force in Georgia except when altered by statute; and it certainly cannot be claimed, that at the common law such a right as that which is asserted by the appellants would prevail.

. [M'Learn v. M'Lellan.]

As to the second point presented by the counsel for the appellants, it is contended that no proceedings by the creditor of the intestate can impair or affect the rights of the heir. The creditors cannot decide who shall suffer by his actions, the heir or the next of kin. He has a right to his debt; but the rights of others, after his debt is paid, are left where he found them. By what rule will the court decide that the creditor may despoil the rights of the heir.

It is important that the court shall look at the facts of this case, in considering the questions arising on this point. The estate of James H. M'Learn was not, at the time of his death, liable for the debts of his father. He had extinguished the debt due as the purchase money of the estate, by substituting for it his own bond and mortgage. Thus the lien on the land when it descended to him was dissolved—was at an end. It was not then to enforce the principle of law that land continues liable to the lien of unpaid purchase money, that the land was sold by the mortgagee.

This court has decided that the equity of the vendor for purchase money, exists only when he has taken no additional security for his debt. So too it is waived by changing the security, and this is considered as waiving the equitable lien. Brown v. Gilman, 4 Wheat. 55, 4 Cond. Rep. 445; same point, 1 Mason 191.

This was done by the creditors of Archibald M'Learn. They took the bond and mortgage of James H. M'Learn; and they ceased to have an equitable lien on the land for any balance of the purchase money.

The court will then sustain the decree of the circuit court, as to the proceeds of the real estate remaining in the hands of the administrator. It is also asked that they will refuse to the appellants the the portion of the proceeds of the personal estate which that court gave to them.

Mr Justice M'LEAN delivered the opinion of the Court.

This case is brought before this court, by an appeal from the decree of the circuit court of Georgia.

From the evidence in the case, it appears that Archibald M'Learn purchased a tract of land in the state of Georgia, on which he established a rice plantation, paid a part of the purchase money, and suffered a judgment to be obtained against him for the balance: that he afterwards died, leaving James H. M'Learn, his only son and devisee: that the property of the deceased consisted chiefly of the

[M'Learn v. M'Lellan.]

rice plantation, and the slaves by which it was cultivated; and that under the laws of Georgia, personal as well as real property is bound by a judgment. That the devisee, to obtain possession of the property, gave his own bond, secured by a mortgage on the land and slaves, for the balance of the judgment: he afterwards died, leaving a part of this debt unsatisfied; and that afterwards the mortgage was foreclosed and paid by a sale of the land.

The complainants are aliens, and being nearest of kin to the deceased, claim as heirs, under the law of Georgia, the personal property; and also the proceeds of the real estate, after the mortgage shall have been paid.

The defendants, M'Lellan and wife, who are more remotely connected with the deceased, being citizens, claim the real estate as heirs, and contend that the debts should have been paid by a sale of the personal property; and that, as the real estate has been sold for this purpose, they insist that the proceeds of this sale should be paid to them out of the personal property.

It appears that after the sale of the land, on application of James Wallace, the administrator, the personal property was sold; and the moneys arising from this sale, as also a surplus, after paying the mortgage, from the sale of the real estate, remain in his hands; and which he is ready to pay over, as the court shall direct. The relationship of the respective parties to the deceased, as set forth in their pleadings, is not disputed.

On the part of the complainants it is contended, that being next of kin to the deceased, under the laws of Georgia they inherit the personal property and are entitled to the proceeds on the sale of the lands. That the personal property goes to them, notwithstanding their alienage is not controverted by the defendants; but they insist that the complainants are not entitled to the proceeds of the real estate.

By an act of the legislature of Georgia, entitled an act to explain and amend the escheat laws, passed the 15th December 1810, it is provided, " that in all cases where a citizen of this state or of the United States, shall die, or may have died, possessed of or entitled to any real estate, and shall leave no heir who can inherit the same, because of him or her being alien; that in such case the said real estate shall not be held or considered subject to escheat, but the executor or administrator of such deceased citizen shall and may proceed, in the manner pointed out by law, to make sale of such real

[M'Learn v. M'Lellan.]

estate, and pay over the proceeds of such sale to the devisee or devisees named in the will of such deceased citizen," &c.

The preamble of this act refers only to the estates of citizens of Georgia who bequeath their property to persons residing in foreign parts; but the first section seems to refer as well to cases of intestacy, as where wills have been made.

The complainants contend, that the words in this statute, "shall leave no heir who can inherit," should be construed to mean, shall leave no heir *next of kin*, or devisee, who can inherit, by reason of alienage; that then the real property shall be sold and the proceeds paid over as by the act is required. And that this construction will give effect to the intention of the legislature; which was, to remove the disability of alienage from the next of kin or devisee of a deceased citizen.

It does not appear that a construction of this statute has been given by the supreme court of Georgia; and we think the construction contended for is not authorized by the words of the statute. Where a citizen shall die leaving *no heir*, must mean not the next of kin, but an heir that may inherit the real estate under the laws of Georgia.

In the present case, the wife of M'Lellan, though remotely connected with the deceased, is within that degree of consanguinity which may claim the inheritance under the law of descents; and of course the land in question descended to her, and consequently it cannot be sold under the law of escheats, for the benefit of the foreign heir.

This construction is not shaken by the act of the 23d December 1789, which provides that, "should any case arise which is not expressly provided for by this act, respecting intestates' estates, the same shall be referred to and determined by the common law of this land, as it hath stood since the first settlement of this state; except only, that real and personal estate shall always be considered in respect to such distribution, as being precisely on the same footing."

The case under consideration is not unprovided for by the laws of the state; as the personal property goes to the next of kin, though they are foreigners, and the land descends to the domestic heir.

In the able printed argument of the complainants' counsel, it is contended that the real estate, equally with the personal, constitutes assets in the hands of the executor or administrator; and a great number of statutes are referred to, in order to sustain this position.

[M'Learn v. M'Lellan.]

The administrator, it is said, may sell the land, and convey it under the sanction of the court; and that in many cases it is sold for the payment of debts, in preference to a disposition of the personal property. And it is stated, that in Georgia there is no marshalling of assets, as in some other states. That the creditor may, in satisfaction of his demand, direct the personal or real estate to be sold at his option; and that the same option may be exercised by the defendant in execution.

It is unnecessary to refer to the various statutes of the state, which have been noticed by the counsel for the complainants. They are similar to the statutes of other states, which make the real estate of deceased persons subject to sale for the payment of debts; and, under the sanction of the court, on the application of the administrators, authorize the sale of such estate. But this does not show that, in the ordinary course of administration, the personal property is not the primary fund for the payment of debts. Indeed, from the oath of the executor or administrator, and his prescribed duty, as well as various provisions in regard to the sale of land for the payment of debts, it would seem, that the personal property, in the state of Georgia; as in, perhaps, every other state of the union; should be exhausted, except under peculiar circumstances, before the land can be sold.

The general management of the real estate, it seems, in Georgia, during the minority of the heirs, devolves upon the executor or administrator: and from the representations of certain gentlemen in the state, who have held high judicial stations, it appears, that the executor or administrator does exercise a very great, if not unlimited control over the management of the real estate of the deceased. It is insisted that the real estate descends to the administrator as assets, and that he may bring an action of ejectment in his own name, to recover the possession of it.

As there are no regular reports of judicial decisions in Georgia, we can derive but little aid from the adjudication of its courts on questions which arise under the local law. But in the view which we have taken of this case, it is of no importance to ascertain the respective liabilities of the personal and real estate of deceased persons, for the payment of debts; nor, indeed, what may be the duties of an executor or an administrator in the settlement of an estate. These would be important in a controversy between the representatives of the estate and its creditors. The case under consideration

does not arise from the claim of creditors, but it involves the rights of distributees. And these rights are not affected by the ordinary course of administration, but depend upon the peculiar facts of the case.

Had the debt for the payment of which the land was sold, been an ordinary debt existing against the estate, and the payment of which was expected to be made by the common course of administration, there could be little or no difficulty in deciding that it should have been paid out of the personal assets ; and as it had not been so paid, to direct, as prayed for by M'Lellan and wife, that the payment from the real estate should be reimbursed by a sale of the personal.

At the decease of James H. M'Learn, his estate, both real and personal, was incumbered by a mortgage, for the payment of which the land was sold. And this mortgage was given in discharge of a judgment which was obtained against his father, Archibald M'Learn, in his lifetime, and which bound the real and personal property covered by the mortgage. A considerable part of this debt was incurred, it seems, by the purchase of this plantation. But the argument that the vendor and his assignee have an equitable lien on the land for the purchase money, seems not to be well founded.

That this equitable lien exists equally in the hands of the vendor or his assignee, is a well settled principle ; but the lien was discharged by the mortgage, which added a large amount of personal property to the real estate to secure the payment of the purchase money.

To learn the nature of the incumbrance on the estate, we must look to the mortgage and the judgment, both of which created a lien upon the whole property ; and also to the debt of the vendor, for which the judgment was obtained. The lien under the mortgage was more favourable to the estate than the lien under the judgment for which it was substituted; as it gave time to the devisee, and placed the estate in his possession and under his control.

With this incumbrance, created in the manner and under the circumstances stated, did this estate, both real and personal, on the decease of James H. M'Learn, descend to his heirs. The personal estate goes to the foreign heirs, and the real estate to the domestic ; and this gives rise to any difficulty which exists in determining this controversy.

If the whole estate descended either to the foreign or domestic

[M'Learn v. M'Lellan.]

heirs, it would be an ordinary case of distribution ; and it could be a matter of little importance whether the mortgage were paid by a sale of the real or personal property. But under the circumstances of the case, it becomes a matter of great importance to the respective claimants, out of which fund this mortgage debt shall be paid. The payment of it out of the real or personal property, will leave but a small balance to the heirs of that fund.

The principles of this case are not changed by the sale of the property. The funds realized from the sale, in equity partake of the same character, and are subject to the same rule as the property which they represent. It is, therefore, a matter of no importance whether the debt has been paid out of the personal or real fund; or indeed, whether it has been paid at all. The court must consider the case as though the real estate were still vested in the South Carolina heirs, and the personal property in the heirs who live in Scotland. In the final decree, it will be necessary to act upon the funds as they now exist in the hands of the administrator.

The important question must now be considered, how this mortgage debt shall be discharged. Shall it be paid out of the real estate, or out of the personal, or out of both ?

That the land should not be wholly exempt from this incumbrance, is clear by every rule of equity which applies to cases of this description. In addition to the consideration that the mortgage binds the land, the fact that a considerable part of the debt was incurred for its purchase, cannot be wholly disregarded. Nor would it comport with the principles of equity to make the whole debt a charge upon the land, to the exemption of the personal property ; as the lien of the mortgage covers the personal as well as the real property, and as at least a part of the debt was contracted on other accounts than the purchase of the land.

The rights of the foreign heirs, under the laws of Georgia, are to be regarded equally as those of the domestic heirs. Each have interests in the property of the deceased, which are alike entitled to the consideration and protection of a court of chancery.

Suppose James H. M'Learn had died leaving a will, by which he devised different tracts of land to different persons capable of taking by devise, and the entire real estate was incumbered by a mortgage, or other lien, which, after the will took effect, had been paid by sale of one of the tracts of land. Could a court of chancery hesitate, in such a case, to require a contribution from the devisees, not affected

by the sale, so as to make the lien a charge upon all the land? The plainest dictates of justice would require this, whether regard be had to the rights of the devisees, or to the intention of the testator. And is not the case put, analogous to the one under consideration?

By the act of the elder M'Learn, his property, both real and personal, was incumbered.

The heirs, both foreign and domestic, of the younger M'Learn, who take this property, take it charged with the continued incumbrance. That James M'Learn had a right, and was bound to continue this charge upon his property, no one will dispute. He might have left the debt, with the consent of the creditor, if there had been no prior lien, to be discharged out of his estate, as the law authorized; and in such case it would have been payable out of the personal estate. Or he might have made the debt a specific charge on his personal property, or on his real; but he did neither. He charged its payment, in pursuance of the judgment lien, on his property both personal and real.

This lien, as between the distributees, fixes the rule by which their rights must be decided. The domestic heirs cannot claim to receive the land free from the lien of the mortgage, nor can the foreign heirs claim the personal property exempt from it. In equity it would seem that each description of heirs should contribute to the payment of the mortgage debt, in proportion to the fund received. This rule, while it would do justice to the parties, would give effect to the intention of the ancestor. That intention is clearly shown by the lien created on the property, and by the rules of equity, such intention must be regarded.

The decision of this case must rest upon familiar and well established principles in equity; and these principles will be shown by a reference to adjudicated cases. In the case of Pollexfen v. Moore, 3 Atk. 272, it appears, Moore, in his lifetime, agreed to purchase an estate from the plaintiff for 1200 pounds, but died before he had paid the whole purchase money. Moore, by will, after giving a legacy of 800 pounds to the defendant his sister, devises the estate purchased and all his personal estate to John Kemp, and makes him his executor. The executor commits a devastavit on the personal estate and dies, and the estate descends upon his son and heir at law. Pollexfen brought his bill against the representative of the real and personal estate of Moore and Kemp, to be paid the remainder of the purchase money. Mrs Moore, the sister and legatee of Thomas Moore, brings her

[M'Learn v. M'Lellan.]

cross bill, and prays, if the remainder of the purchase money should be paid to Pollexfen out of the personal estate of Moore and Kemp, that she may stand in his place, and be considered as having a lien upon the purchased estate for her legacy of 800 pounds. And the lord chancellor said, " that the estate which has descended from John Kemp, the executor of Moore, upon Bayle Kemp, comes to him liable to the same equity as it would have been against the father who has misapplied the personal estate : and in order to relieve Mrs Moore, I will direct Pollexfen to take his satisfaction upon the purchased estate, because he has an equitable lien both upon the real and personal estate, and will leave this last fund open, that Mrs Moore, who can at most be considered only as a simple contract creditor, may have a chance of being paid out of the personal assets."

This case shows, that in England the rule which requires the personal property to be first applied in the payment of debts, is deviated from where the justice of the case and the rights of parties interested, require it.

Had the debt due to Pollexfen been directed to be paid out of the personal property, it would have left no part of that fund to pay the legacy of Mrs Moore ; and for this reason the debt was decreed to be paid out of the land. Now if the mortgage debt, in the present case, shall be directed to be paid out of the personal fund, it would defeat the foreign heirs, whose claim to this property under the law of Georgia, cannot be less strong than a bequest.

In 3 Johns. Ch. Rep. 252, it is laid down, as between the representatives of the real and personal estate, that the land is the primary fund to pay off a mortgage. And in 2 Bro. 57, lord Kenyon, as master of the rolls, laid down the same rule : that where an estate descends, or comes to one subject to a mortgage ; although the mortgage be afterwards assigned, and the party enter into a covenant to pay the money borrowed ; yet that shall not bind his personal estate.

There is no doctrine better established than that the purchase of land, subject to a mortgage debt, does not make the debt personal; and on the question being raised, such debt has been uniformly charged on the land. And this principle is not changed where additional security has been given.

In the case of Evelyn v. Evelyn, 2 P. Wms 659 ; where A mortgaged the land for 1500 pounds ; and his son B covenanted with the assignee of the mortgage to pay the money. He succeeded to

the premises after the death of his father, and died intestate. The question was, whether his personal estate, under the covenant, should be applied in payment of the mortgage ; and it was decided that the land should be charged, and the covenant was only considered as additional security.

In the case of Waring v. Ward, 7 Ves. 334, Lord Eldon says : " the principle upon which the personal estate is first liable in general cases is, that the contract primarily is a personal contract ; the personal estate receiving the benefit : and, being primarily a personal contract, the land is bound only in aid of the personal obligation to fulfil that personal contract." It has long been settled, therefore, that upon a loan of money, the party meaning to mortgage, in aid of the bond, covenant or simple contract debt, if there is neither bond nor covenant ; his personal estate, if he dies, must pay the debt for the benefit of the heir. But suppose a second descent cast ; and the question arises, the personal estate of the son, and his real estate, descended to the grandson : then the personal estate of the son shall not pay it, as it never was the personal contract of the son.

And this is the well established rule on this subject. If the contract be personal, although a mortgage be given, the mortgage is considered in aid of the personal contract ; and, on the decease of the mortgagor, his personal estate will be considered the primary fund, because the contract was personal : but if the estate descend to the grandson of the mortgagor, then the charge would be upon the land, as the debt was not the personal debt of the immediate ancestor.

And so, if the contract was in regard to the realty, the debt is a charge on the land. It is in this way that a court of chancery, by looking at the origin of the debt, is enabled to fix the rule between distributees.

In the case under consideration, the mortgage was given by James H. M'Learn, but it was not given to secure a debt created by him. The mortgage merely changed the security, but did not affect the extent of the judgment lien. And this judgment was obtained, chiefly, for the purchase money of the estate. In effect, the debt for which the judgment was obtained against Archibald M'Learn, and for which the mortgage was given, constituted an equitable lien on the land ; and had the mortgage covered only the land, it must have been considered the primary fund. The debt for which the mortgage was given, was not the personal contract of James H. M'Learn, but the contract of his ancestor in the purchase of the estate. But

if the contract was personal, and might have been a charge on the personal estate devised to James H. M'Learn, yet the character of the debt, in this respect, is changed in the hands of the present heirs. In the language of Lord Eldon, this debt cannot be a charge on the personalty, because it was not created by the personal contract of James H. M'Learn.

This, under the authorities cited, would be the rule for the payment of the mortgage debt, if James H. M'Learn had not executed a mortgage on the personal as well as the real property, which, as devisee, he received from his father.

This mortgage on the personal property cannot be considered in the light of additional surety to the lien which before existed. If it could be considered in this light, the land would still be the primary fund, and the personal mortgage as surety or auxiliary to the land. But this mortgage can in no respect be considered as additional surety. It might have been so considered in reference to the equitable lien of the vendor for the purchase money, as such lien was limited to the land; but the lien of the judgment obtained against the ancestor of James H. M'Learn, and for which the mortgage was substituted, extended, as before remarked, to the personal as well as real estate of the defendant.

The debt then for which the mortgage was given did not arise from the personal contract of James H. M'Learn, but by the contract of his ancestor; and the mortgage was given in discharge of the judgment. This created no new lien upon the personal property. It came to James H. M'Learn under the will of his father, subject to the lien of the judgment. The mortgage then did not and was not intended to create any new charge upon the personalty; but to continue, in a different form, that which already existed.

In this view the charge on the personal estate can no more be disregarded than the charge upon the real; and in this respect this case differs from the cases referred to. The charge on both funds, under the mortgage, may be compared to a will devising the funds to the respective heirs now before the court, as the statute provides; and leaving the debt as a charge upon his real and personal property. Can any doubt that such a bequest would be considered by a court of chancery as a charge upon both funds? Now, although James H. M'Learn has made no will, as in the supposed case, yet he gave a mortgage to continue the charge on the personal property which existed under the judgment; and the law of Georgia fixes the rule

of descent. This act of the ancestor, connected with the Georgia law of descent, gives as decided and clear a direction to the property, both real and personal under the mortgage, as if in his last will James H. M'Learn had so devised it. Both funds being charged with the mortgage debt must be applied to its payment, in proportion to their respective amounts. And as the property, both real and personal, has been converted into money, the proportionate part of each can be applied to this payment without difficulty.

And any debts of the estate not covered by the mortgage must be paid out of the personal fund.

As the decree of the circuit court was not made in conformity to this view of the case, that decree must be reversed; and the cause remanded to that court, with instruction to enter a decree in conformity to this opinion.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Georgia, and was argued by counsel; on consideration whereof, it is the opinion of this court, that the mortgage debt should be paid out of the real and personal property embraced by the mortgage pro rata: whereupon, it is ordered, adjudged and decreed by this court, that the decree of the said circuit court in this cause be, and the same is hereby reversed; and that this cause be, and the same is hereby remanded to the said circuit court for further proceedings.