O'Conner, Adm'x, v. O'Conner.

---

* O'CONNER, Adm'x, v. O'CONNER.

(*Knoxville.*  October 19, 1889.)

1. ADMINISTRATION.  *Marshaling assets.*  *Discharge of liens on lands descended.*

The heir is entitled, as against the distributee, to have the personal estate of an intestate applied in extinguishment of liens upon the lands descended for purchase-money, which the intestate, by contract with his vendor, agreed to pay either to the vendor directly, or to some third person designated by the vendor in discharge of a pre-existing lien on the land.

Cases cited : 3 Johns. Ch., 229, 254, 257; 2 Brown's C. C., 101, 604; 2 P. Wms., 664; 20 Beavan, 380, 383; Salk, 449; 5 W. R., 747; 3 Vesey, 128; 5 Vesey, 534; 7 Vesey, 336; 14 Vesey, 418.

2. CONTRACTS.  *Promise for benefit of third person.*

Vendee's agreement with his vendor to pay the purchase-price of land to a third person, designated by the vendor—being a former incumbrancer—renders the vendee liable to such third person for the amount, and the same may be recovered by suit of such person against the vendee or his personal representative.

Cases cited and approved: Moore *v.* Stovall, 2 Lea, 543; 20 N. Y., 268; 24 N. Y., 178; 14 Iowa, 476; 4 Ohio St., 333.

(See Railroad *v.* Houston, 85 Tenn., 224.)

---

FROM KNOX.

---

Appeal from Chancery Court of Knox County. H. R. GIBSON, Ch.

---

* This cause was heard at September Term, 1888, and held over by the Court under advisement.—REPORTER.

WEBB & McCLUNG for Complainant.

R. N. HOOD and JOHN W. GREEN for Respondents.

LURTON, J.   Thomas O'Conner died in 1882 intestate and without issue, leaving a large real and personal estate.   Under the statute of descent and distribution his widow, who is likewise his administratrix, is his sole distributee, and entitled, after payment of his debts, to his entire personal estate. The heirs at law to whom his real estate descends are the brothers and sisters of the intestate and the representatives of such as were dead.   Thus the heirs and distributees are not the same persons, and this fact has given rise to a controversy as to whether the personal estate is in equity the primary fund for the discharge of certain incumbrances upon lands of the intestate.   The parties in interest have submitted to the Chancery Court an agreed case as provided by the statute, and from the decree of the Chancellor the administratrix has appealed.   The agreed case shows:

That, at the time intestate acquired one of the tracts of land which he owned at his death, it was subject to a vendor's lien to secure certain purchase-money notes made by the immediate vendor of Mr. O'Conner; that Mr. O'Conner, as a part of the consideration for the purchase, expressly assumed and agreed to pay off this incumbrance, and to pay to his immediate

vendor an additional sum of three thousand dollars. This agreement was contained in the deed to O'Conner, and to secure the payment of both sums a lien was retained on the face thereof. Notes were executed and delivered for the sum to be paid his immediate vendor, but there was no substitution of intestate's notes for those of the seller, and no communication whatever between Mr. O'Conner and the creditor.

At Mr. O'Conner's death no part of the purchase-money due on this tract of land had been paid, neither that which was due directly to his immediate vendor, nor that which he had assumed and engaged to pay for his vendor. The lien of the original purchase-money, as well as that due immediately from intestate to his vendor, was subsequently enforced in a suit against the heirs to whom the incumbered land had descended, and to which the administratrix of O'Conner was not a party; and these incumbrances have been paid by a sale of the land. The heirs now ask to have the sums thus enforced against their lands re-imbursed out of the personal estate of the intestate, which it is admitted is sufficient for this purpose.

A second tract which descended to the heirs was incumbered with a lien to secure purchase-money notes made by the intestate. This lien has been likewise enforced under a bill against the heirs and the land sold for its satisfaction, and for this sum they likewise seek re-imbursement out of the personalty.

Two questions arise upon these facts:

First, is the personal estate the primary fund, as between the distributee and the heir, for the satisfaction of a lien or charge upon lands at the time they were acquired by the intestate, the lien not being to secure a debt originally created by the intestate, but one assumed by him as a part of the consideration to be paid for the land where there has been no communication between the intestate and original vendor to whom the debt thus assumed was due?

The second question is whether a debt created by the intestate for the purchase of land is, as between the distributee and heir, a primary charge on the personal estate; or does the heir take the land *cum onere?*

It may be at the outset admitted that where lands descend subject to a charge, or mortgage, or lien not created by the intestate, and which was never his personal debt, or one for which he could have been held personally liable by the creditor, that the heir in such case would take the land subject to the incumbrance, and could not call upon the personal estate to have his lands exonerated from the burden. This would follow for the obvious reason that the incumbrance was never the debt of the intestate, and his administrator could not therefore be called upon to discharge it. The first matter to be determined before we can reach a solution of the first question is to decide whether the intestate had made himself personally

responsible for the incumbrance. The agreed case
states that in the deed accepted by the intestate
there was a clause whereby the vendee assumed
the unpaid purchase-money and undertook and
agreed to pay the same. It is true this promise
or assumption is not made directly to the creditor,
but only to the vendor, who was the debtor. The
payment of this incumbrance was, however, a part
of the consideration for the land. The undertak-
ing, in effect, was that the vendee should pay to
the vendor the sum of three thousand dollars, and
in addition should assume and pay off this lien
upon the land. The price the vendee was to pay'
for the land was the sum of three thousand dol-
lars plus the lien debt. That this was the plain
intent and meaning is most manifest from the fact
that the covenant in the deed is not merely that
he took the land subject to the incumbrance, or
that the vendor was to be indemnified against
personal liability on account thereof, but that he
expressly agrees to assume and pay off the out-
standing notes for purchase-money due from his
grantor to the vendor of the latter, and these
notes, and their dates and amounts and payee, are
precisely described. To secure the grantor against
default, either in the payment of the lien debt
thus assumed or in the payments to be directly
made to him, an express lien is retained on the
face of the deed accepted by the purchaser. This
was therefore not a promise to pay the debt of
another, or to be answerable for the debt, default,

or miscarriage of another; but was a promise rather to pay his own debt to a third person designated by his creditor.

That the intestate, by the acceptance of the deed containing this assumption of the lien debt, made himself personally responsible to the creditor holding the lien, will not, at this day, admit of doubt.

Upon this subject Mr. Pomeroy says: "The mortgageor may not only convey the premises 'subject to' the mortgage; he may also convey them in such a manner that the grantee assumes the payment of the mortgage debt, and thus render himself personally liable therefor. The element which lies at the bottom of such assumption, and which alone gives it efficacy according to the theory held by some Courts, is the fact that the mortgage debt is included in the purchase-price, as a constituent part thereof, and the grantee actually secures or pays to his grantor only the balance of the gross price after deducting such debt. No particular form of words is necessary to create a binding assumption. It is sufficient that the language shows unequivocally an intent on the part of the grantee to assume the liability of paying the mortgage debt; but this intent must clearly appear. When the deed executed by the grantor contains a clause sufficiently showing such an intent, the acceptance thereof by the grantee consummates the assumption, and creates a personal liability on his part which inures to the benefit

of the mortgagee, as though he had himself executed the deed." 3 Pom. Equity Jurisprudence, Sec. 1206.

The person who thus assumes a mortgage or lien debt becomes, as to the mortgagor or lienor, the principal debtor and the mortgageor a surety. Upon such a promise the original vendor could have maintained an action at law. *Moore & Miller* v. *Stovall*, 2 Lea, 543.

This is upon the ground that the original vendor, in adopting the act of the vendee for his benefit, is brought into privity with the promisor, and may enforce the promise as if it were made directly to him. *Lawrence* v. *Fox*, 20 N. Y., 268; *Burr* v. *Beers*, 24 N. Y., 178; *Thompson* v. *Bertram*, 14 Iowa, 476; *Thompson* v. *Thompson*, 4 Ohio State, 333.

But it is insisted that if it be admitted that the intestate had made himself personally liable to the incumbrancer by the assumption of the debt in the manner heretofore shown, that this promise and liability is only collateral; that the debt being one not originally contracted by him (his liability growing out of his promise to pay it), only makes it his debt with respect to the land, which continued to be charged with the lien, and which was therefore the primary fund for its payment; and that the rule in equity, in respect to incumbrances upon lands descended is, that if the incumbrance was not created by the ancestor, and the debt was not originally the debt of the an-

cestor, that the heir takes the land *cum onere* and cannot call upon the personal estate to exonerate it; and that this rule is not affected by the fact that the ancestor has made himself personally liable, unless there be something in addition indicating a clear intention that the personal estate shall be the primary fund for the payment of the debt. This presents a question concerning the marshaling of assets which is altogether *res integra* in this State.

It is a general rule at common law and in .equity that debts shall be primarily payable out of the personal estate, and that the land shall only be subjected as auxiliary to the personalty. In this State, by statute, both the personalty and the lands of an intestate are assets for payment of debts, but the latter cannot be subjected until the former is exhausted. These principles are fundamental, and need no elaboration. When, therefore, a creditor whose debt is secured upon the land elects to go upon the latter, as he may, the heir will be re-imbursed out of the personalty. This is the undisputed rule where the debt was the personal debt of the intestate and one originally created by him. In every such case the election of the creditor to enforce his mortgage is not suffered to disappoint the heir; for the personalty, being the primary fund for payment of such debts, it must re-imburse the heir for the loss of the land, the latter being entitled to exoneration. Thus far there is no room for controversy. Neither can

it be seriously denied that in the case under consideration the creditor could, at his election, have recovered the debt secured by lien from the personal representative. But it is insisted that if such a creditor should, at his election, rely upon his right to satisfaction out of the personalty rather than pursue his remedy by enforcement of his lien, in that event the personal representative could call upon the heir for re-imbursement, upon the ground that, as to the debt thus paid, the land (as between the personal representatives and the heir), was the primary fund and the personalty the auxiliary. In other words, that the land must ease the personalty in case of debts of this character. The rule heretofore stated as to the primary liability of the personalty to the payment of the debts of an intestate is likewise the general rule as to the payment of legacies and of the debts of a testator. But this is a mere rule for the determination, as between those to whom the land may be devised and those to whom the personalty may be bequeathed, where the testator has made no other direction as to which shall be the fund primarily liable. The testator may, undoubtedly, entirely or partially change the natural order of liability, either by express words or by a plain indication of such intention. It has been lamented by a long line of Judges that the rule governing the construction of wills had not been that nothing but *"express words"* would be held sufficient to alter the course and order of the law

concerning the primary liability of the personalty to pay both debts and legacies. Lead. Cases Eq., Vol. I., Part II., 892 (4th Ed.).

The question here presented is not one arising under a will claimed to alter the natural order of liability, for there is no will. But it is nevertheless an analogous question, the alteration of the usual order of liability, arising, it is claimed, from *acts in pais* of the testator, whereby the land, and not the personalty, is the primary fund for the payment of this debt. It may be here premised that the doctrine here invoked arises only where the testator or intestate has acquired by purchase or otherwise lands which at the time were subject to mortgage or other incumbrance. The incumbrance being for a debt not originally created by the purchaser, he is generally presumed not to intend to subject his personal estate as the primary fund for its payment, but rather to intend that the land shall discharge the burden. This doctrine, as stated by Chancellor Kent, is this: "When a man," says he, "gives a bond and mortgage for a debt of his own contracting, the mortgage is understood to be merely a collateral security for the personal obligation. But when a man purchases, or has devised to him, land with an incumbrance on it, he becomes a debtor only in respect to the land; and if he promises to pay it, it is a promise rather on account of the land, which continues, notwithstanding, in many cases, to be the primary fund. The same equity which in other cases makes

the personal estate contribute to ease the land, as between the real and personal representatives, will here make the land relieve the personal estates. There is," says he, "good sense and justice in the principle; and I feel the force of the doctrine that it requires very strong and decided proof of intention before the Court can undertake to shift the natural course and order of obligation between the two estates." *Cumberland* v. *Codrington*, 3 Johns. Ch. Rep., 257.

The doctrine just quoted is the deduction of the learned Chancellor after reviewing the English equity cases, though in other parts of his opinion he recognizes certain important distinctions and qualifications, which will hereafter be noticed. See also Story's Eq. Jur., 571–577, and 1248 *et seq.*

The American editors of White & Tudor's Leading Cases in Equity thus sum up the doctrine: "The weight of authority would therefore unquestionably seem to be that the personal estate will not be primarily liable, unless the testator has not merely made himself answerable for the payment of the mortgage, *but has made the debt directly and absolutely his own*, or has in some other way manifested an *intention* to throw the burden on the personalty in ease of the land." Part I., page 926 (4th Ed.).

The question in all the cases has been whether or not the facts and circumstances showed such an *adoption* of the debt as to make the personalty the primary fund for its payment. A careful ex-

amination of the reported English decisions makes it exceedingly difficult to extract any distinct rule by which it may be determined when a purchaser has so manifested his intention to adopt the debt as to take a particular case out of the general rule which makes the realty the primary fund for the payment of an incumbrance existing upon lands purchased by a decedent. By all the cases it is held that a mere dry covenant, by which the purchaser agrees to indemnify his vendor against an incumbrance, is insufficient.

*Cumberland* v. *Codrington*, 3 Johns. Ch., 229. This case presented no other question, the learned Judge distinctly stating that in the deed conveying the incumbered estate there was " only a naked and dry covenant of indemnity." *Ibid.*, 254. All that is said in the case as to the rule under any other circumstances is nothing but *dicta*.

So there are cases holding that when lands are purchased subject to a mortgage and the vendee enter into bond at the time, or subsequently, to pay off the incumbrance, that this alone, without other circumstances, will not be regarded as a sufficient demonstration of his intention to make it his personal debt with respect to the fund primarily liable for its payment. *Billinghurst* v. *Walker*, 2 Brown's C. C., 604; *Evelyn* v. *Evelyn*, 2 P. Wms., 664, and a number of other cases cited in the very full note of Mr. Cox to the case last cited. These cases proceed upon the notion that the assumption of the incumbrance

was only by way of collateral security, the land
remaining the principal debtor and the primary
fund for its payment. Very slight circum-
stances, however, will, it seems, suffice to take
a case of the latter class out of the rule. As,
for instance, in the case of the *Earl of Oxford* v.
*Lady Rodney*, where the purchaser of the equity
of redemption at the same time covenanted *with
the mortgagee* to pay his debt, and agreed upon
new terms and conditions of payment. This was
held to distinguish the case from *Tweddel* v.
*Tweddel*, and to make the personal estate primarily
liable. 14 Vesey, 418.

*Waring* v. *Ward*, opinion by Lord Eldon, pre-
sents another case where slight circumstances, in
addition to a covenant to pay, were held enough
to make the debt the personal debt of the vendee.
7 Vesey, 336. See also *Woods* v. *Huntingford*, 3
Vesey, 128.

Another rule may be deduced from the decided
cases with a good deal of certainty, which is this:
*That where the incumbrance is assumed as a part of
the purchase-price, and the vendee makes himself in
any way directly liable to the creditor for the amount
of the incumbrance, that, in such case, the personal
estate is the primary fund for the payment of the
incumbrance.*

To satisfactorily show the ground upon which
this conclusion is reached, it becomes necessary to
briefly consider some of the adjudged cases.

*Tweddel* v. *Tweddel*, 2 Brown's C. C., 101, is

termed a leading case, and is certainly the most extreme of the many cases touching upon this doctrine. That case was this: An estate was purchased subject to a mortgage; the purchaser covenanted to discharge the mortgage debt and to indemnify the vendor, and to pay the agreed purchase-price, *less amount of the mortgage*, to the vendor. Lord Thurlow held the land the primary fund, and refused to exonerate it, on bill of the heir, out of the personal estate. Now, that case, in all of its particulars, is like the one under consideration, and it might be well assumed to be a very commanding authority. But the reasoning of the learned Judge, when examined, shows most conclusively that it is not—in view of our own decisions as to the effect of a covenant to pay the incumbrance as a part of the purchase-price— of any weight whatever. He put his decision distinctly upon the ground that the personal estate is not chargeable in equity when it is not at law, saying: "The land was the original debtor, *and the mortgagee could not bring his action against the executor, or any other party, but merely against the original debtor.*" He proceeds: "*When it is a debt payable by executors at law, this Court will relieve* the heir by turning the charge upon the executor, provided it does not interfere with other debts and legacies, or any more substantial claims." 2 Brown's Ch. Rep., 101.

Upon the reasons of the Chancellor, the decree should have been the other way, for the creditor

clearly could have maintained a direct action at law against the vendee. Chancellor Kent himself questioned this case, suggesting that the rule was not applicable in that case, saying : " When the indenture between the mortgageor and purchaser recited an agreement by which A had agreed to pay out of the purchase, to the son and heir of the mortgagee, the principal and interest due on the mortgage, being £2,155, and the residue of the purchase-money, being £1,345, to the mortgageor, it might be a question whether the son and heir could not have sued at law for that money as so much received for his use. It has been held that if one person makes a promise to another for the benefit of a third person, that third person may maintain an action at law on that promise." 3 Johns. Ch. Rep., 254.

That an action at law would lie on such a promise has been expressly decided in this State. *Moore* v. *Stoval*, 2 Lea, 545.

This case, in the subsequent case of *Woods* v. *Huntingford*, 3 Vesey, 128, was commented on by Lord Kenyon as follows: "*Tweddel* v. *Tweddel* amounts only to this: that when a man buys subject to a mortgage, and has no contract or communication with the mortgagee, and does no other act to show an intention to transfer that debt from the estate to himself (as between the heir and executor), but merely that which he must do, if he pays a less price in consequence of that mortgage— that is, indemnifies the vendor against it—he does

not by that act take the debt upon himself personally." * * * Again he says: "There was no communication with the mortgagee, but upon the sale there was *a mere covenant of indemnity* against the mortgage by the vendee."

This case thus limited, and the *facts changed from those stated in the report of the case,* becomes a sound opinion, but is of no authority for the contention of the administratrix, and its reasoning is altogether against the rule invoked.

The case of *Butler* v. *Butler* was decided in 1800. It was a case of a purchase of a mortgaged estate, the vendee merely covenanting with his vendor that he would indemnify him against the mortgage. The briefs of counsel admit that the vendee had not made himself personally liable to the mortgagee by a mere covenant of indemnity, and the decision was put upon the ground that he had not made himself personally liable.   5 Vesey, 534.

The case of *Billinghurst* v. *Walker,* 2 Brown's C. C., 604, was this: A rectory subject to a charge was devised. The devisee subsequently assigned the devised estate and executed his bond to the person in whose favor the charge was, to pay interest during his life, and that his executors and heirs should pay off the principal within three months after his death. The bearing this case has upon the one at bar is not on account of its facts or of the decision, but for the reasoning of Lord Thurlow as to what facts and circumstances would show such an adoption of an assumed debt

as to make the personalty the primary fund for its discharge. Lord Thurlow said: "I agree that if the testator has shown an intent to take the debt upon himself it will become his debt; but here the old security remained, and he merely gave a collateral security. If there was any thing in the marriage contract which bound him to exonerate this estate from the debt, it would become his personal debt, but there is nothing in the contract like that. When a man transfers a mortgage which is not his own debt, his executing a bond as a collateral security does not vary the nature of the charge; it is only a necessary act in the transfer. I do not mean that it does not make him personally liable to the creditor, but it does not throw the charge upon his personal estate. Nothing passed here to vary the charge. *All the cases of sale have turned upon this: whether the charge was considered a part of the price.* The mere purchase of an estate subject to charges—as, an equity of redemption—does not make the personal estate of the purchaser liable to the charge; *but if the charge is part of the price, then the personal estate is liable.*"

This clear announcement that "if the charge is part of the price" the personal estate is liable, is but an announcement of the rule as stated by the English editors of Leading Cases in Equity, citing *Cope* v. *Cope*, Salk., 449, and *Belvidere* v. *Rochfort*, decided by House of Lords (Wallis), Rep. by Lynn, 45: Smith's Lead. Cas., Vol. I., Part II., 904.

The case of *Cope* v. *Cope* is not accessible, but the case of *Belvidere* v. *Rochfort*, having been decided by the highest English Court, and before the independence of these United States, is of very high authority. The case was one of a sale of premises subject to a mortgage, the deed stating that the mortgage debt and interest were to be paid and discharged by the purchaser out of the consideration agreed to be paid. On the back of the deed was indorsed a receipt for the £900 paid as a consideration, in this manner, viz.: "£450 on the perfection of the deed, and £450 allowed on account of the mortgage." The purchaser, Lord Rochfort, died, never having paid the mortgage debt. By his will he devised the mortgaged estate. The devisee, upon bill filed, obtained a decree that the mortgage should be paid by the personal representative. This decree was affirmed by the House of Lords.

Another case directly in point, and of the same high authority, because decided long before our independence, is that of *Parsons* v. *Truman*, decided in 1751 by Lord Hardwicke. As the case is reported by Cox in his note to *Evelyn* v. *Evelyn*, 2 P. Wms., 664, it was this: A purchased an estate for £90, which was at that time mortgaged for £86, and he covenanted to pay £86 to the mortgagee and £4 to the vendor. The Lord Chancellor held that, although the covenant was with the vendor only, and that the vendee's personal estate was not therefore liable in that respect to

the mortgagee (which would not be the law in this State), yet the words were sufficiently strong to show an intention in the vendee to make it his personal debt. It was accordingly held that the personal estate must exonerate the heir.

These three earlier cases are not by any subsequent cases overruled. When we analyze the reason upon which they rest, it will be seen that the subsequent cases are not even in conflict. The ground upon which the land in any case is held to be the primary fund is not that the contract is a contract concerning realty, or even for the benefit of realty. In some of the cases, the Court, in endeavoring to get at the *intention* of the purchaser in order to determine whether the one fund or the other should be the primary fund, have, as a circumstance, referred to the fact that the engagement which had been entered into was for the *benefit* of the incumbered land. The suggestion in argument that the intent is to be determined by an inquiry as to whether the debt assumed, or the promise to pay, or the covenant to discharge, was for the benefit of the vendee's personalty or realty, is not supported by the cases. If it were so, then money borrowed to buy land or improve land, and secured by a mortgage on land, would be primarily a charge on the land. So the notes of the vendee executed to his immediate vendor for the purchase-price would be a debt incurred for the benefit of the land, and hence primarily a charge on the land. This extreme has never, it

is believed, been held by any Court. On the contrary, the English notes to Leading Cases in Equity say:

"Again, if a person bought an estate and thereby contracted a debt with the vendor, and for the purpose of securing it gave a charge on the estàte, and entered into a covenant to pay it, it would be the personal debt of the purchaser, and his personal estate would be liable to pay it. And it will make no difference whether the purchase-money was to be paid in a gross sum or from time to time, by way of annuity for life; it is equally a debt and charge upon the personal estate, and in either case the personal estate is the primary fund to pay it." Vol. I., Part II., 904 (4th Ed.); *Yonge* v. *Furse*, 20 Beavan, 380–383.

So, under the English Act of 1854, declaring mortgaged lands in all cases the primary fund for the discharge of such mortgages, unless the decedent by will expressly declared otherwise, it was held *not* to make a vendor's lien a primary charge upon the land. *Hood* v. *Hood*, 5 W. R., 747; *Barnwell* v. *Isemonger*, 1 Drew & Sm., 255.

The Act was subsequently amended so as to include such liens.

Therefore, a debt created for purchase-money of land not being within the rule contended for, it would seem to follow, without discussion, that a debt *assumed as part of the purchase-price* would be just as decidedly the personal debt of the vendee as that part of the purchase-money covenanted to

be paid directly to his immediate vendor. There is no distinction between the two engagements; and the early English cases cited heretofore, holding that where the incumbrance is to be paid off as a part of the purchase-price the incumbrance becomes a charge primarily upon the personal estate, are unquestionably to be regarded as sound upon principle and commanding as authorities upon this Court.

We have not deemed it necessary in this opinion to consider how far we would be willing to be governed by the highly artificial rules by which an incumbrance is held to be primarily dischargeable out of one fund or the other. It would seem that where the vendee has assumed the debt, in such a way as to give to the creditor a right of action against him or his representatives, that this, of itself, would be a sufficient adoption and sufficient demonstration of his intention to put such a debt on the footing of a personal liability. But this is not now decided. Under the well-settled principles of equity as administered in courts of equity, where all these artificial distinctions as to the origin of the debt have been adopted, the debts which have been paid by a resort to the lien on the land of the heir were the personal debts of Mr. O'Conner, and the personal estate was the primary fund for their payment. The costs taxed to the heir in the foreclosure suits are properly payable by the administrator. It was the duty of the administrator

to have exonerated the heir's land. These costs have been thrown upon the heir by reason of the failure of the administrator to relieve the heir before suit. The costs of this cause will be paid by the administratrix and the decree of the Chancellor in all respects affirmed.

Hon. B. J. Tarver sat upon the hearing of this case in the room and stead of the Chief Justice, who was absent; and he, taking part in the decision of this cause, did not agree with the conclusions here reached, and has filed a dissenting opinion.

---

### DISSENTING OPINION.

B. J. TARVER, Sp. J. The complainant's assignment of errors correctly states the material facts involved in this controversy, and the same is here copied, viz.:

"Thomas O'Conner died intestate, in Knoxville, October 19, 1882, without issue, leaving a widow (the complainant) his sole distributee, and his brothers and sisters (the defendants) his heirs at law. He left a valuable real and personal estate, and was in debt about $500,000. His widow administered on the estate, and has paid all the debts except about $10,000 and some interest, and the balance of the personal estate is merely nominal, having no market value.

7 P

" The defendants have realized over $200,000 in cash from the real estate, and will realize $50,000 more. At the time of said O'Conner's death three parcels of his real estate were incumbered with purchase-money liens, as follows: (1) Sanford lot, about $1,000; (2) the Moffatt farm, about $5,000; (3) the one-half interest in the Williams-McKinney place, about $13,000.

"About $10,000 of the lien upon the third pur-chase was resting upon it at the time O'Conner purchased it, and was for purchase-money due from O'Conner's vendors to Samuel McKinney, from whom said vendors had purchased it. The $3,000 was the amount which said O'Conner owed his vendors upon this purchase, who conveyed the in-terest sold to O'Conner, retaining in face of the deed a lien for the payment of the $3,000; also a recitation that said O'Conner assumed and agreed to pay the $10,000 incumbrance on the land to McKinney. O'Conner accepted the deed and went into possession. The other liens were for purchase-money due direct by said O'Conner to his vendors, and said liens were retained in the deeds convey-ing him said real estate. The administratrix did not pay off said liens out of the personal estate, but the lien-holders foreclosed them by sale of the property, and the proceeds of sales were applied in discharge of the said liens. The heirs demanded that the administratrix should re-imburse them to the extent that proceeds of said lands were applied to the discharge of said liens, etc.

"The Chancellor decreed that the administratrix was bound to re-imburse said heirs this money out of the personal estate, and rendered judgment against her for about $24,000 and all the costs of the several causes in which said liens were enforced. The complainant has brought the case here, and has assigned three errors to the action of the Court below."

Complainant's second assignment of error is: "The $10,000 purchase-money due from O'Conner's vendors to McKinney was a primary liability resting upon the land, and that O'Conner's undertaking as to said incumbrance was merely secondary, and, as between the heirs and personal representatives, his personal estate is not liable."

This precise question has not heretofore been before this Court, and is practically an open one in Tennessee. Our Code system for administering estates of decedents does not provide for the state of facts presented by this assigned error. We have the opportunity of determining this question under the light of adjudged cases in Courts of last resort, and gaining from them whatever of wisdom they may afford.

The Chancery Court of England, more than two centuries ago, held that where one acquired real estate already incumbered, if he did no more than assume or undertake to discharge it, as between himself and his vendor, the real estate so acquired continued the primary fund for its payment, and the personal liability of the purchaser was merely

auxiliary. This proposition received the approval of its finest judicial minds, and was never · questioned by them. Some uncertainty and collision in the adjudications of the English High Court of Chancery came in when it was attempted to determine what amount of contracting with the incumbrance owner by the purchaser would make his (purchaser) personal liability primary and not secondary. Some of the Judges held if the last purchaser or taker entered into a contract with the prior incumbrancer, and bound himself to discharge it, or if the incumbrance was deducted from the gross price at which he purchased, then his liability was primary. But the weight of the adjudged cases in England was against this last proposition, though supported by many fine lawyers. The better opinion held the purchaser's liability merely secondary, and the real estate the burden-bearer, primarily liable for the discharge of the incumbrance. We refer to the able and exhaustive opinion of Chancellor Kent in *Duke of Cumberland* v. *Cadnington*, ·3 Johns. C. H., 252 *et seq.*, in which he collects and reviews the English adjudged cases bearing on this question during a period of more than a century.

The most distinguished law writers in England concur with Chancellor Kent in the result reached by him in his review of the cases.

Mr. Spence says: "The rule—the one making personalty the primary fund—only applies to those debts which were properly the debts of the testator.

In all other cases, where the real estate was the original debtor and came to the possessor as such, it must continue to bear the burden, even though the testator, when he purchased the estate, entered into a collateral contract, or covenant, or gave a security for the payment of the debt; that the estate first burdened must first be resorted to." 2 Spence's Equity, 335.

Mr. Powell on Mortgages says: "A purchases an estate subject to a mortgage, and covenants with the mortgagee to discharge the same. A's personal estate not liable to exonerate the land purchased." This author, continuing in the same connection, adds: "The personal estate not having received any addition to its funds by reason of the mortgage." These citations from Powell are quoted and approved by Sir Wm. Grant in *Hancock* v. *Abbey*, 11 Vesey, 139.

It will be noted that these two eminent masters of the law go further than the case in hand. It does not appear from the record that the intestate gave any bond, covenant, or other obligation to the incumbrancer, McKinney, to discharge his debt.

Williams on Executors says: "Again, if a man buys an estate subject to an existing mortgage, the lands remain the proper fund for its discharge, and the heir or devisee cannot throw the debt upon the personalty as the primary fund for its payment." 2 Williams on Executors, 1535, 1536; 2 Roper on Legacies, 957, 958; 3 Jarman on Wills, 477; Adams' Equity.

Redfield on Wills, 878, after stating the rule making the realty incumbered when acquired the primary fund for its payment, says: "In order to make the purchaser's personalty primarily liable, the purchaser must by contract make himself personally liable and directly liable to the owner of the incumbrance; and even a covenant or bond for the purpose will not be sufficient unless accompanied with circumstances showing a decided intention to make thereby the debt personally his own. * * * This rule prevails in most of the States of this Union; only three have attempted to vindicate a different rule, and in those three States there is no separate Chancery Court."

*Condent* v. *Condent*, a New Jersey case decided in 1886, and reported in 4 Central R., 132, is to the same effect. See also *Mount* v. *Varess*, 33 N. J., 264; *Sutherland* v. *Harrison*, 86 Ill., 366; Hunt's Appeal, 92 Pa., 494; Bispham's Equity, Sec. 344; 3 Pomeroy's Equity, Sec. 1206; Story's Equity, Secs. 574–576, 1248, 1248*e*; 2 Lomax on Executors, 413; 2 Leading Cases in Equity, Part II., 922.

In the case in hand the intestate had no negotiations with the owner of the incumbrance touching it, in any particular. He gave no note or other obligation to his vendors for the payment of the debt upon the land at its purchase. The deed conveying him the land contains a recital of the existence of the incumbrance and intestate's assumption and promise to pay it, and the intestate accepted the deed and went into possession of the

land under it. "This is the head and front of his offending" in this direction. It will be noted that the principle applicable to these facts has not been questioned in England or the States of this Union (excepting three) during a period of two hundred years, and that there has been no conflict upon it, but only upon the question, What acts of the purchaser will make the incumbrance his debt and his personal estate primarily liable for its payment? and that the weight of authority upon this phase of the question was adverse to the primary liability of the purchaser.

Sir Wm. Grant, in 15 Vesey, 198, says: "Where a person becomes entitled to an estate subject to a charge and then covenants to pay it, the charge still remains primarily on the real estate, and the covenant is only a collateral security, because the debt is not the original debt of the covenantor."

It is well settled by the ablest Courts and law writers in this and the mother country "that the personal estate will not be primarily liable unless the testator has not merely made himself answerable for the payment of the mortgage, but has made the debt directly and absolutely his own, or has, in some other way, manifested an *intention* to throw the burden on the personalty in ease of the land."

We are aware it has been objected that the high authorities cited to sustain the principle laid down above are not Tennessee authorities, and therefore not binding on this Court; that we have

a system of statutes of our own regulating the administration of decedents' estates, and that this system, as explained by our adjudged cases, should determine and settle the question raised by the second error of complainant's assignment. Is this objection well taken? There are no provisions of our Code touching the administration of estates that provide for a case circumstanced as is the one in hand. It is not a creditor seeking under these laws to subject realty to sale in order to pay his debts; nor an administrator or executor for the creditor seeking to reach realty as a means of paying the debts of a decedent. The creditor enforced his lien for purchase-money in the Courts; had sale and payment of his debt from the proceeds of the realty. The heir at law now asks to be re-imbursed the sum paid from the proceeds of his land. The granting of his prayer depends upon the equity of his case, and whether his land was the primary fund for the payment of the debt paid by his inheritance. Our Code makes both real and personal property assets for the payment of debts, the latter the primary and the first the auxiliary fund for payment, unless this order has been changed by the decedent in his life.

As between legatee or distributee on the one hand, and the devisee or heir at law on the other, our Code and the adjudged cases of this Court permit the decedent to determine which shall be the primary and which the auxiliary fund for paying debts and legacies. His intention or pur-

pose thereupon, either express or by necessary implication, is sufficient to control the question, provided its certitude is reasonably apparent.

We are not shut up to a will alone for this intent; we may get it from the *res gestæ*—the facts of the transaction, connecting the decedent with the incumbrance. It may be express or by necessary implication. Bispham's Equity, 347, 348.

It is to be noted that the Judges, in the cases cited *supra*, considered and interpreted the facts of the transaction to find proper evidence of the decedent's intention to charge his personalty in ease of the burdened realty.

Lord Cooper, in 1 Peere Williams, 347, after detailing the facts of the transaction, said: "The covenant was only an additional security for the satisfaction of the lender, and was not *intended* to alter the nature of the debt."

Chancellor Kent, 3 Johns. C. H., 362, after saying there must be a direct dealing with the owner of the lien debt, adds: "And that will not be enough, unless the dealings with the mortgagee be of such nature as to afford decided evidence of an *intention* to shift the primary obligation from the real and personal fund."

2 Story's Equity, Sec. 1248c, on the same point, has this language: "And even a covenant and bond for the purpose will not be sufficient, unless accompanied with circumstances showing a decided *intention* to make thereby the debt personally his

own." Mr. Redfield on Wills, in nearly identical language, lays down the same rule.

The inquiry is not, did the decedent charge the McKinney land primarily with the $10,000 incumbrance—this debt had been fastened upon it before intestate's purchase—but it is, did Thos. O'Conner *intend* to relieve the land by throwing upon his personalty the primary liability of its payment? If we are precluded from considering and interpreting the facts of the purchase for the answer to the question (he dying intestate), we have no evidence of an intention to exonerate the land with his personalty; and hence, clearly, the heir cannot call on the distributee to re-imburse him for the discharge of the McKinney debt.

But considering the facts of the purchase of the McKinney land by the intestate, is there proper evidence of *intent* to exonerate? The vendor's lien in favor of McKinney was fastened on the land, being retained in the face of the deed to intestate's vendors. O'Conner made no contract with the lien owner; gave no note or other obligation to him for it. He merely accepted a deed from his vendors, which dryly recited the existence of the incumbrance, and that intestate assumed and agreed to discharge it; but nothing further was said or done by him in the direction of its discharge. This fixed lien was left by the parties undisturbed, a primary charge upon the land.

It is clear this purchase was made for the benefit or increase of the real estate. This fact,

under the old rule (which will be discussed below), was evidence of an intention and purpose on the part of the purchaser that the land purchased should be the primary source of its payment. Evidently the intestate intended his personalty to be in aid of the realty merely. For the reasons stated, and under the high authorities cited, I hold that the McKinney land was first liable for the payment of the McKinney $10,000 debt, interest and cost, and that the heir is not entitled to a recovery against the administratrix for re-imbursement therefor.

We feel less certain in disposing of the three one thousand dollar notes given by the intestate to his vendors on the purchase of the McKinney land. These notes are for an additional sum, needed to acquire the half of the McKinney land, were in aid of the purchase, and come under the rule laid down by Mr. Lomax, as follows: "So, in cases where the lands come to the deceased by descent or devise (will purchase vary the rule?), his concurrence in the mortgage deed and his personal covenant for the payment of the money on the assignment or transfer of the mortgage, being only by way of additional security to the mortgage, will not alter the burden as between his real and personal representatives. And the same principle, if other estates are added to the security on a further sum lent, or if there be a covenant on his part increasing the rate of interest. And it seems that if the sum borrowed by him and

added to the original mortgage be comparatively small, equity will not consider that he had different *intentions* as to these different sums, but will charge the real estate with the whole." See 2 Lomax on Executors (margin), 248.

The sum covered by the three notes is small compared with the incumbrance debt, being a little less than one-third its size. According to the rule above given, equity will not consider he had a different intention as to these different sums, and, therefore, the real estate should be charged with both sums as the primary source of payment.

Complainant's first error assigned denies the right of the defendants to re-imbursement on these facts: The intestate bought of Sanford real estate at the price of $1,650; paid $550 cash, and gave notes for balance. He purchased of Moffatt real estate at $4,500, and gave his notes therefor. Each vendor made a deed of the real estate sold by him to intestate, retaining lien for purchase-money upon the land conveyed. Each enforced his lien upon the real estate against the heirs at law, and had their debts paid from the proceeds thereof. These proceedings were after death of intestate, and the realty so sold was situated in or near the city of Knoxville. The presumption is that this realty was bought by the intestate on speculation, and he intended and purposed to pay the sums due thereon from the proceeds thereof when sold.

Complainant insists that no case has been passed

upon by this Court identical in its facts and defenses with the one in hand. We have found none determined by Courts of last resort in the United States, except one or more adjudged by the Supreme Court of Massachusetts, wherein the Court briefly held that the contract of purchase was a "personal" one, upon which the purchaser might have been sued, judgment had, and the debt collected from his personal estate; and for that reason held the personalty the primary fund for payment, and the realty merely in aid of it.

Complainant admits that the non-lien creditor cannot subject the land to sale for the payment of his debt until he shows complete exhaustion of the personalty, or its insufficiency to pay debts. She insists the lien creditor can proceed to enforce his lien upon the realty in the first instance, without reference to the personalty; that there is neither statute nor decision of this Court settling the identical question presented here; that the question is equitable, to be settled by deciding where the superior equity is; that complainant's contention is supported by the superior equity, the controversy being between the heirs at law and distributee, creditors and legatees having no interest therein.

On the last analysis, lying back of the fact of a "personal contract," on which the Massachusetts cases put the primary liability on the personalty, is this inquiry: Was the contract for the increase-benefit of the realty or of the personalty? Its

answer determines which estate is first liable. If the realty, by this test, is first in liability, the contract made for the purchase-money, though capable of being ripened into a personal judgment against the purchaser, is secondary in its character and in aid of the realty.

This rule was formulated and used by the Courts of England more than two hundred years ago in settling questions identical with those now before this Court; and since its introduction into the judicial history of the mother country we remember no decision of her Courts questioning its soundness. It should be noted that at the date of its first use, personalty constituted the only fund for the payment of debts in England. A favoritism, the outgrowth of the old feudal system, so completely "hedged the realty about" that it was rarely made to pay debts of decedents. In the United States, property of a decedent, of all kinds, is and has been applied to the payment of his debts. It has been made so now in England. Our institutions and laws constitute a soil more favorable to the growth and vigor of this old rule than that of its origin, and in this country we would expect to see it oftener applied and its authority less questioned than in the land of its nativity. This old rule has been cited and approved by the Supreme Court of the United States in *McLearn* v. *McLearn*, 10 Pet., 644. Judge McLean, in delivering the opinion of the Court, quoted Lord Elden as saying, in 7 Vesey, 334,

O'Conner, Adm'x, *v.* O'Conner.

that "the principle upon which the personal estate is first liable in *general* cases is that the contract primarily is a personal contract, the personal estate receiving the benefit." Judge McLean, continuing, says: "And so, if the contract was in regard to the realty, the debt is a charge upon the land. It is in this way that a Court of Chancery, by looking at the origin of the debt, is enabled to fix the rule between the distributees." We state, generally, that many of the State Courts and law writers in the United States cite and approve this "rule," but they need not be referred to here with more particularity.

When the "rule" was adopted in England, personal property did not have its present volume or importance. The mortgages upon real estate were nearly, without exception, for borrowed money, and vendor's liens were very rare, and cut no figure in the current litigation of that day. The Courts, in that formative period, explained the facts of the transaction from which grew the debt to ascertain the intent of the debtor to charge his real or personal estate with its payment. Those able Judges had little of precedent to guide them, but much of good common sense, and large acquaintance with and understanding of the motive and purpose moving to action in the affairs of everyday life. To this circumstance is largely due the excellence of those early decisions. These fathers of our inherited jurisprudence, guided by their practical good sense and level-headed wisdom, in-

terpreted the making of the debt for the increase of and benefit to the personalty to mean that the debtor intended that estate should be burdened primarily with its payment. Hence, all debts for personal property, services, loaned money, and mortgage debts, which made up the considerations supporting the great bulk of the indebtedness of that period, were held to be for the benefit of the personalty; and, consequently, it was first chargeable with their payment. These Judges were too clear-headed not to know that the converse of this rule, when applied to real estate, was axiomatically true also; but as the occasion of its application was rare, there being few land transactions, there are few rulings of the Courts upon it to be found in the early reported cases. If the personalty receiving the benefit coming from the creation of a debt means that the debtor intended it should first be chargeable, why does not the same result follow to the realty, when it gets the benefit? Why should it be true as to personalty and untrue as to realty?

The Courts proceed, in principle and reason, upon the same line when they sift the facts to determine the relative liability *inter partes* of two or more persons, jointly and severally bound upon the same instrument. If it is reasonably certain, upon weighing the facts, that one signed with the intent to be bound as principal, and the others as sureties, the Courts do not hesitate to so declare their rights and to enforce them accordingly.

Likewise, the determination of the many questions arising in the settlement of partnerships, involving the conflicting rights of firm and individual creditors as to their priorities of payment from firm and individual means, is largely controlled by the *intent* and purpose of the parties impressed upon the particular transaction. In fact, the rule giving the several priorities is the outgrowth and fruitage of the express or presumed *intent* of the parties to the transaction in relation thereto. Death and intestacy do not affect the question, and the "personal contract" idea, though a prominent fact, is silent, while the Courts give expression to the *intent* of the parties in settling and fixing the relative liability of persons and funds in the two classes of cases hereinbefore referred to.

Also a tract of land subject to a lien is sold off from the lien debtor successively, in separate parcels, at different times, and conveyed by deeds registered when made. The lien, if enforced by sale of the land, must be in the inverse order of alienation. The first sub-purchaser may force this order in the sale of the parcels. This equity grows out of the presumed *intention* of the several sub-purchasers, and may be enforced, notwithstanding death and intestacy have intervened.

Other contentions might be cited wherein the express or presumed *intention* of the parties impressed upon the transaction is the controlling fact with the Courts in fixing the liability of persons or funds, but those named are deemed sufficient

8 P

for this purpose to show the constant practice of the Courts in giving a controlling influence to the *intent* of parties in settling the larger part of the current litigation of the day.

Where the claims of creditors have been paid with no opposing statute nor adjudications of this Court, and where the title to both realty and personalty flows from the same source—the intestate —why should not his *intent* impressed upon his property control the question which it shall enrich, his heir or his distributee? What good reason is there for making this an anomaly, an exception to a rule of such general application?

This Court, in *Mason* v. *Swan*, 6 Heis., 457, goes far to sustain this rule. Swan sold a lot to Mason by parol, who put valuable improvements on it, but did not pay purchase-money. Swan died, and Mason disaffirmed the contract and sued for the value of the improvements. This Court held the lot the primary fund for the payment. Judge Nicholson, speaking for the Court, said: "The real estate, and not the personal, is benefited by the improvement, and equity necessarily fixes the liability for the benefit on the real estate."

The principle of *Swan* v. *Mason* has been applied to similar facts by nearly all the Courts of this Union, and the reason of the rule, whenever applied, is the same—viz., the realty, having received the benefit, must be held first liable for the payment therefor. The "personal contract" on the part of Swan had no bearing in the decision.

John Marshall, of Franklin, Tenn., a great name in the law, sat as Special Judge in *Franklin* v. *Armfield*, 2 Sneed, 356, 357. This great lawyer held the executor, who had paid off an incumbrance upon a parcel of land, partly with his own means and partly with assets in his hands, was entitled to be re-imbursed therefor, and that the land, relieved from the burden resting on it when it came to the devisee, was chargeable therewith as the primary fund.

The "personal contract" theory, as a test to determine which estate is to be first chargeable with a debt, has been shifting and unfixed in its nature, as may be seen in the overruling of *Campbell* v. *Findley*, 3 Hum., after an interval of half a century, by Stovall's case in 2 Lea by a divided Court, and the century of discordant opinions in England, and to some extent in New York, as to what makes a binding personal contract in the sense of the rule.

It should be observed that the two foremost States in intelligence, wealth, and culture, have cleared up the question by clean-cut legislative enactments providing that the descended realty of decedents shall, in all cases, be the primary fund for payment of any debt fastened upon it by mortgage, etc., when it came to the heir, unless there is a clearly expressed intention to the contrary in the will of decedent.

The better rule, we think, is to let the answer to the inquiry—which estate got the benefit—fix

the primary liability.  If the debt is for borrowed money, and is secured by a mortgage on real estate, the personalty has been benefited thereby; and the Courts for more than a century held these facts, by necessary implication, evidence of the decedent's *intention* to charge his personalty with the burden of discharging the mortgage debt in exoneration of the realty; not an intention shown in a will, but impressed upon and inhering in the very fiber of the transaction from which came the debt.  When the debt is the price of land bought, why will not these facts, under the same rule, *evidence* an *intent* to charge the incumbered land primarily, as the debt was made for the increase of the land?  Why shift the rule, and say the personalty is the primary fund to pay because it is the " personal debt" of the decedent?

In strictness, the canons of descent devolved upon the heirs only the excess of the market value of the realty over the incumbering unpaid purchase-money, with the privilege to them, upon discharging that debt, to be invested with the fee-simple.  The intestate took just this interest in the realty purchased, and no more was transmitted to his heirs.  He consented to the retention by his vendors of so much of the realty purchased as would be sufficient to pay its price, and thereby appropriated and set apart that interest as means charged with the payment of the price of the realty.

Presumably the purchases from Moffat and San-

ford were on speculation, and intestate intended to pay the debts created in the purchase from the proceeds, when sold. As between the heir and the distributee, should not that *intent* of intestate to make the realty first liable to pay off the burden be effective, not as an intent evidenced by a will, but one impressed upon and woven into the very texture of the transaction by the intestate himself?

Does public policy or public good, or the uniformity of the rules for administering the estates of decedents, favor or oppose the settlement of these open questions, as already indicated? It can only be a practical question when the distributee and heir are not the same person, which is rarely the case. Under our laws of distribution and descent, the heir and distributee are never different persons, except when one dies circumstanced as was Thomas O'Conner, or without wife, or husband, or children, where the distributee is an old, and perhaps needy, parent.

The intestate was largely in real estate speculation in a growing city, where real estate was rapidly enhancing in value. The purchases were made with the expectation of early sales, at fine profits; he meets a sudden death; no testament is made providing for his childless widow, and if the personalty is to relieve the realty of the incumbrance for its purchase-money, the heir will be enriched and the widow and distributee impoverished. The superior equity is certainly in her

favor. The heir is in a Court of Equity asking that equity be done. Will equity re-imburse the heirs at the expense of the distributee?

The reasoning upon the first error assigned by complainant is equally applicable to the three one thousand dollar notes given to intestate's vendors in the purchase of the McKinney land. We reach a conclusion as to this error with less certainty than we had as to the McKinney incumbrance; but still we feel justified in holding that the heirs are not entitled, in equity, to be re-imbursed for sums paid upon the Moffat and Sanford parcels of land from the proceeds of said lands.

This disposes of the third assigned error of complainant adversely to the claim of the heirs at law; and upon the whole case we hold that the Chancellor is in error and should be reversed, and that the heirs at law pay the cost of this cause in this and the Court below.

Entertaining these views, I am compelled to dissent from the opinion of the majority of the Court in this case.