B. H. WILKINS et al. v. JAMES R. JETTON et al.

Middle Section. September 22, 1928.

Petition for Certiorari denied by Supreme Court, February 9, 1929.

A. L. Davidson, of Tullahoma, and J. W. Rankin, of Martin, for appellants.

E. D. Hancock, of Murfreesboro, and Leighton Ewell, of Manchester, for appellees.

FAW, P. J. The bill in this case was filed in the chancery court of Coffee county on February 3, 1926, by B. H. Wilkins and nineteen others, as complainants, against James R. Jetton, a citizen and resident of Rutherford county, Tennessee, Ed Ray, a citizen of the State of Florida, J. B. Noblett and H. L. Noblett, citizens and residents of Coffee county, Tennessee, and the Gulf Refining Company, "a corporation having its place of business with agents in Tullahoma, Coffee county, Tennessee, and other counties in the State of Tennessee," as defendants.

Before final decree an agreement was reached between the complainants and the defendants Ed Ray, J. B. Noblett and H. L. Noblett, whereby all matters of controversy between these parties were adjusted and settled, and this agreement was "made a decree of the court."

The suit against the defendants James R. Jetton and Gulf Refining Company was finally heard and a decree was entered (on June 15, 1927) in and by which the Chancellor found and adjudged that the causes of action alleged in the bill against defendants Jetton and Gulf Refining Company were fully met and denied by the answers and not supported by the proof, and the bill was thereupon dismissed as to said last named two defendants, at the cost of the complainants.

The complainants appealed from the aforesaid final decree dismissing their bill against defendants Jetton and Gulf Refining Company, but complainants are not complaining in this court, through assignments of error or otherwise, of the decree in favor of the Gulf Refining Company, and, as Jetton and the Gulf Refining Company were not sued as joint obligors and no privity is shown between them, the decree of the chancery court dismissing the bill against Gulf Refining Company will, as a matter of course, be affirmed.

After final decree, defendant Jetton appealed from an interlocutory decree of the Chancellor overruling a motion by defendant Jetton to dismiss the complainants' bill against him.

The complainants, as appellants, have assigned errors upon the Chancellor's findings and decree in favor of defendant Jetton and adverse to them, and defendant Jetton has assigned as error the action of the Chancellor in overruling and denying his motion to dismiss complainants' bill against him.

It is thus seen that the litigation in this court is entirely between the complainants on the one hand and defendant Jetton on the other hand, and we need not concern ourselves with the relation of the other defendants below to the subject-matter of the suit, any further than may be necessary to elucidate the determinative issues between the complainants and defendant Jetton.

In order that the issues to be determined may be better understood, certain undisputed facts disclosed by the record will be first stated.

The "People's Service Stations, Incorporated," a Delaware corporation, was domesticated in the State of Tennessee on April 17, 1920, and thereafter, in the year of 1920, it begun preparations to establish places of business and engage in the sale of gasoline, oils and automobile accessories in a number of towns in the State of Tennessee, including the town of Tullahoma in Coffee county.

644

During the summer of 1920, and prior to the inauguration of its aforesaid business in Tullahoma, the People's Service Station, Incorporated, sold to the complainants and others forty "certificates," each of which (omitting the· date) was in words and figures as follows:

"Participating Operation Certificates.

"People's Service Station, Inc.

"Be it Known, that the People's Service Station, Inc., a corporation, organized and existing under and by virtue of the laws of the State of Delaware, for and in consideration of the receipt of two hundred and fifty dollars, and other good and valuable considerations, agrees to create a fund from the operation of the so-called service station in the place designated on the reverse side hereof, and to distribute said fund in the manner hereinafter set forth to the registered owner of this certificate, and all other registered owners of such certificates in said station, and such distribution shall continue until there shall have been paid on this certificate the sum of five hundred dollars, whereupon it shall become null and void.

"To provide the fund hereinbefore mentioned, from the daily receipts of said station there shall be set aside in a bank one and one-half (1½) cent on ·each gallon of gasoline and five. (5) per cent on all other merchandise sold by said station, and the fund thus created shall be distributed every month among the registered holders of these certificates in said station as their interests may appear.

"This certificate is registered in the name of the owner on the books of the corporation, and such registration is endorsed hereon and no transfer shall be binding on the corporation unless made on the books of the corporation at the request of the registered owner, and similarly endorsed hereon.

"In Witness Whereof, The People's Service Station, Inc., has caused these presents to be signed by its President and its corporate seal to be hereunto affixed, and to be attested by its Treasurer, this the —— day of July, 1920.

"People's Service Station, Inc.,

"By T. F. Maddox, President.

"Attest          C. E. Eaker, Treasurer.

"Recorded July ——, 1920.  By C. E. Eaker."

The "place designated on the reverse side" of each of the certificates involved in this case was, Tullahoma, Tennessee.

On December 16, 1920, the People's Service Stations, Incorporated, entered into an agreement with the Diamond Oil Company, also a Delaware corporation domesticated in Tennessee, for the consolidation and merger of the two corporations into a single

corporation under the name and style of Diamond Oil Company. This consolidation and merger was authorized by, and was made in accordance with the requirements of, the laws of the State of Delaware, and was consummated by the registration of the "certificate of consolidation and merger" in the office of the Secretary of State of Delaware on March 24, 1921. As a result of this consolidation and merger, the Diamond Oil Company became vested with title to all the property and assets, and assumed all the liabilities and duties, of each of the two merging corporations.

The Diamond Oil Company sold, and conveyed by deed dated May 13, 1922, its stations, equipment, and all other property owned by it, at Tullahoma, Shelbyville, Lewisburg and Lebanon, to defendant Jetton. The deed of conveyance thus made is in words and figures as follows:

"State of Tennessee:

"Know all men by these presents, that whereas the Diamond Oil Company, a corporation duly incorporated under the laws of the State of Delaware, U. S'. A., has by resolution of its Board of Directors and Stockholders which resolution reads as follows: 'Be it resolved by the Board of Directors of the Diamond Oil Company that L. G. Aymard of Memphis, Tennessee, is hereby authorized and empowered to act for the company in all matters pertaining to the sale and transfer of its stations, property and business at Lebanon, Tennessee, Lewisburg, Tennessee, Shelbyville, Tennessee, and Tullahoma, Tennessee, and to execute for the company, all papers necessary to the transfer of said stations, property and business.

"'(Signed)    O. M. Hobbs, Secretary.

"'Attest:

"'D. H. White, President.'

"Authorized the sale of certain of its properties hereinafter designated and whereas L. G. Aymard, acting under said resolution has contracted for the sale of said properties to James R. Jetton, of Murfreesboro, Tennessee.

"Now, therefore, in consideration of $10 and other valuable considerations paid, receipt of which is hereby acknowledged, the said Diamond Oil Company, incorporated under the laws of the State of Delaware, by virtue of and under the authority of a resolution duly  passed by its Board of Directors, and stockholders, at a special meeting, duly called for that purpose has this day bargained and sold, and does hereby grant, convey and transfer to James R. Jetton, of Murfreesboro, Tennessee, his heirs and assigns, forever, all the rights, privileges, and everything contained in and pertaining to the contracts

and leases owned by said Diamond Oil Company, Incorporated, and lying and being situated in the Counties of Wilson, Coffee, Marshall, and Bedford, all in the State of Tennessee, and for a particular description of said properties, leases, rights and privileges, the following recorded leases of same are hereby relied upon and referred to for the description of same, to-wit:

"Lease, granted by Doke Aydelott, to People's Service Stations, Incorporated, dated October 22, 1920, and recorded in Trust Book No. 26, page 320, of the Register's Office of Coffee county, Tennessee.

"Lease granted by E. I. Hitt, and T. L. Huffman, to People's Service Station, Incorporated, dated September 17, 1920, and recorded in Book 26, page 339, of the Register's Office of Coffee county, Tennessee.

"Lease granted by H. M. Taylor to People's Service Station Company, Incorporated, dated July 28, 1920, and recorded in Book No. 50, of mortgages pages 8 and 8 of the Register's Office of Wilson county, Tennessee.

"Lease granted by Lewisburg Stone Company to People's Service Station, Incorporated, dated October 23, 1920, and recorded in Book 'T' No. 2, page 307, of the Register's Office Marshall county, Tennessee.

"Lease granted by James L. Morton to People's Service Stations, Incorporated, dated July 30, 1920, and recorded in trust deed book No. 27, page 352-3, of the register's office, Bedford county, Tennessee.

"And the following unrecorded contracts:

"Contract Nashville, Chattanooga and St. Louis Railway Company granted by said Railway Company, to Diamond Oil Company, Incorporated, dated June 14, 1921, for pipe line privileges, and spur track privileges in the city of Tullahoma, Coffee county, Tennessee.

"Contract Louisville & Nashville Railroad Company granted by said Railroad Company to Diamond Oil Company, Incorporated, for certain pipe lines and spur track privileges, in the city of Lewisburg, Tennessee, dated March 24, 1921.

"Contract granted by Nashville, Chattanooga and St. Louis Railroad to People's Service Stations, Incorporated, dated November 24, 1920, for certain pipe line and railroad spur track privileges in Bedford county, Tennessee.

"Included in said leases are all equipment now a part of the stations belonging to the said Diamond Oil Company at Lebanon, Shelbyville, Lewisburg and Tullahoma, Tennessee, and also the gasoline and kerosene storage tanks, pumping equipment, pipe lines and loading and unloading apparatus, includ-

ing four Ford trucks with compartment tanks, and one White truck with compartment tank, forming the wholesale storage plants in the cities of Lewisburg, Shelbyville, Lebanon and Tullahoma, all in the State of Tennessee, and also all stocks of gasoline, kerosene, lubricating oils, greases and accessories now on hand at either the retail or wholesale stations in said cities, and also all accounts for merchandise sold, now due—and uncollected—the said Diamond Oil Company, at any of said stations, and including all real and personal properties and rights in realty belonging to said Diamond Oil Company in said counties of Wilson, Bedford, Coffee and Marshall, Tennessee.

"To have and to hold the said above described properties to the said James R. Jetton, his heirs and assigns, forever. The said Diamond Oil Company covenants with the said James R. Jetton that it is lawfully seized and possessed of said properties, and has a perfect right to convey the same, and that the same are unencumbered, except by the terms and stipulations of the following participating operation certificates issued and outstanding, namely:

"Tullahoma, Tennessee, forty participating operation certificates; Lebanon, Tennessee, forty participating operation certificates; Lewisburg, Tennessee, forty participating operation certificates; Shelbyville, Tennessee, thirty-three participating operation certificates.

"The said James R. Jetton takes said properties subject to the contractual obligations of the said Diamond Oil Company, as expressed in said certicates, but he does not personally nor individually assume said obligations, but the corporation to be known as the J. R. J. Oil Company, to be hereafter organized, is to assume the obligations of said Diamond Oil Company, with reference to said certificates.

"And the said Diamond Oil Company covenants with the said James R. Jetton and hereby binds itself to warrant and defend the title to the said properties, and lease rights hereinbefore conveyed to him, his heirs and assigns, against the lawful claims of all persons whatsoever, and by virtue of the resolution authorizing the execution and delivery of this instrument to the said James R. Jetton the undersigned, D. H. White, President, has hereunto signed the name of the said corporation, the Diamond Oil Company, and by the authority of said resolution, affixed to this instrument the corporate seal of the said Diamond

Oil Company, and the same is hereby attested, by O. M. Hobbs, Secretary of said Diamond Oil Company.

"This 13th day of May, A. D. 1922.

"Diamond Oil Company,

"Attest: By D. H. White, President. (Seal)

"C. M. Hobbs, Secretary. James R. Jetton."

The foregoing deed was duly acknowledged for registration by the grantor and grantee and was registered in the register's office of Coffee county, on August 21, 1922.

It is seen that the recited consideration in the foregoing deed from the Diamond Oil Company to Jetton was $10 and other valuable considerations paid." The undisputed proof shows that the agreed consideration for the conveyance was $25,000, of which $15,000 was to be, and was, paid in cash, and for the remaining $10,000 defendant Jetton agreed to turn over to the Diamond Oil Company $10,000 par value of preferred stock and one hundred shares of "no par value common stock" of the J. R. J. Oil Company when incorporated,—the J. R. J. Oil Company being a prospective corporation not then in existence, but which defendant Jetton agreed that he would thereafter incorporate and organize.

After taking over the properties conveyed to him by the Diamond Oil Company as aforesaid, defendant Jetton decided that the organization of the proposed corporation by him was not desirable, and, as a result of negotiations between him and the Diamond Oil Company, the latter agreed to release Jetton from his contract to organize the J. R. J. Oil Company, upon the payment to it by Jetton of the sum of $5500, this being one-half of the price for which Jetton sold the "Stations" at Tullahoma, Shelbyville and Lewisburg,—it being agreed between the Diamond Oil Company and Jetton that the latter should sell the three "Stations" just named and pay one-half the sum received therefor to the Diamond Oil Company.

Pursuant to the aforesaid agreement between defendant Jetton and the Diamond Oil Company, defendant Jetton sold the Tullahoma Station to Ed Ray, defendant below, and on January 2, 1923, Jetton executed a deed to Ed Ray, as follows:

"State of Tennessee)

"Coffee County )

"For and in consideration of the sum of two thousand dollars, cash in hand paid, receipt of which is hereby acknowledged, I, James R. Jetton, hereby sell, transfer, assign and convey to Ed Ray of said county and State, his heirs and assigns, forever, all the rights, privileges and everything con-

tained in, and pertaining to the following described leases and contracts, to-wit:

"First: A certain lease made September 17th, 1920, by E. I. Hitt, and T. L. Huffman to the Peoples Service Stations Company, Inc., covering the following described property; a lot situated in the town of Tullahoma, Tennessee, in the thirteenth district of Coffee county, Tennessee, and being part of Lots Nos. 10 and 11 in Section 12 in the town plan of Tullahoma, fronting northwest on Grundy street seventy-five feet and running back in a southeasterly direction 110 feet to Lot No. 9, said lot being bounded on the northwest by Grundy street, southwest by M. E. Church lot, southeast by Lot No. 9 and northeast by Miller and Gibbs Lot, said lease being recorded in Trust Book No. 26, page 339 in the register's office of Coffee county, Tennessee.

"Second: A certain lease made October 22, 1920, by Doak Aydelott of Tullahoma, Tennessee, to Peoples Service Stations Company, Incorporated, covering the following described property situated on the corner of Anderson street and the Mc-Minnville and Sparta Branch railroad, fronting fifty feet on said railroad and 150 feet on Anderson street, being a parallelogram fifty by one hundred feet, said lease being recorded in Deed Book No. 26, page 324, of the register's office of Coffee county, Tennessee.

"Third: A certain contract of license granted by the Nashville, Chattanooga Railway to the Diamond Oil Company, of Memphis, Tennessee, covering the use of a pipe line across tracks and right of way, a full description of which is shown in the plat made a part of the original contract or license mentioned, said contract being dated June 14th, 1921.

"The said above described leases were acquired by the Diamond Oil Company of Memphis, Tennessee, from the Peoples Service Stations, Incorporated, through merger dated December 16th, 1920, and transferred and assigned by the said Diamond Oil Company to the said James R. Jetton by deed dated May 13th, 1922, and recorded in Deed Book No. 32, pages 475-6-7, in the register's office of Coffee county, Tennessee, an the above described contract was transferred and assigned by the Diamond Oil Company under the instrument of assignment and transfer above referred to.

"Included in said leases and contract above described is all the equipment now a part of the station belonging to the said James R. Jetton and also the gasoline and kerosene storage tanks, pumps, pipe lines and loading and unloading apparatus, together with one Ford truck with tank formerly used in con-

nection with the wholesale storage plant at Tullahoma, Tennessee, together with all and any rights of any and all kinds the said James R. Jetton may have in the said property or properties herein described.

"To have and to hold the said above, described property to the said Ed Ray, his heirs and assigns, forever. The said James R. Jetton covenants with the said Ed Ray that he is lawfully seized and possessed of said properties and has a perfect right to transfer and convey the same and that the same are unencumbered, except as may be under and according to the terms and stipulations of forty (40) participating operation certificates heretofore issued and outstanding the liabilities and obligations under which are hereby fully assumed by the said Ed Ray, the said certificates having been issued by the said Peoples Service Stations, Incorporated.

"And the said James R. Jetton hereby covenants with the said Ed Ray, and hereby binds himself to warrant and defend the title to the said property and leasehold rights herein assigned and conveyed to him, his heirs and assigns, against the lawful claims of all persons whomsoever.

"In Witness Whereof the said James R. Jetton has this day affixed his signature to the foregoing instrument, this January 2nd, 1923.

"James R. Jetton
"Ed Ray."

The foregoing conveyance from Jetton to Ray was duly acknowledged for registration by the grantor and grantee, and was registered on November 15, 1923, in the register's office of Coffee county.

On September 1, 1923, the Diamond Oil Company executed a formal release and acquittance of defendant Jetton from his aforesaid contract relative to the incorporation and stock of the J. R. J. Oil Company, which release was in words and figures as follows:

"This memorandum of agreement entered into this, the 1st day of September, 1923, by and between the Diamond Oil Company, a Delaware corporation and James R. Jetton of Murfreesboro, Tennessee.

"Witnesseth, That whereas on May 13th, 1922, the parties above mentioned entered into a contract whereby the said James R. Jetton was to purchase from the said Diamond Oil Company its service stations, wholesale storage plants and business at Lebanon, Tennessee, Shelbyville, Tennessee, Tullahoma, Tennessee, and Lewisburg, Tennessee, for a considera-

tion of $25,000, it being fully understood and agreed by the parties thereto and being a part of that contract of purchase that the Diamond Oil Company subscribe and pay the sum of ten thousand ($10,000) dollars for one hundred shares of preferred stock of the par value of one hundred ($100) dollars per share and one hundred shares of common stock of no par value in a company to be organized by the said James R. Jetton for the operation of an oil business at the locations covered by the above-mentioned contract of purchase.

"And, whereas the said contract of purchase and the agreements therein contained have all been complied with the execution that the said James R. Jetton has not organized the company as agreed upon and has not delivered to the said Diamond Oil Company the shares of stock as agreed upon.

"Now, therefore, it is understood and agreed between the parties hereto that in consideration of the payment to the said Diamond Oil Company by the said James R. Jetton of three thousand five hundred ($3,500) dollars in cash and a promissory note executed by the said James R. Jetton to the said Diamond Oil Company in the amount of two thousand ($2,000) dollars due in sixty days from date, the said James R. Jetton is hereby fully released and relieved from compliance with that part of the original contract of sale requiring the organization of a company as above described and delivery to the said Diamond Oil Company of the shares of stock above described, it being the understanding and intention of the parties hereto that the cash payment and delivery of the note as above mentioned shall constitute a complete fulfillment of the original contract of sale.

"Further in consideration of the payment herein described and the agreements herein contained the Diamond Oil Company expressly agrees to pay all the real estate and personalty taxes assessed against the four properties covered by this contract for the year of 1922.

"In witness whereof the said parties have hereunto signed their names his first day of September, 1923.

"Diamond Oil Company, Inc.
"By D. H. White, President.
"(Seal)
"(Diamond Oil Co.) O. M. Hobbs, Sec'y.
"D. H. White
"James R. Jetton."

Ed Ray went into possession of the property conveyed to him by defendant Jetton on January 2, 1923, and operated the retail serv-

ice station until December 1, 1923, when he sold the entire property and business to defendant J. B. Noblett, who formed a partnership with his son, the defendant H. L. Noblett, and said firm of J. B. Noblett & Son thereafter operated the retail service station and, (we infer from the record) they were still in possession and operating same at the time the final decrees were entered in this cause.

By written indorsements thereon, Ed Ray assigned and transferred to J. B. Noblett & Son the leases acquired by Ray from defendant Jetton as aforesaid, but whether or not Ed Ray executed any other written conveyance to the Nobletts does not appear from the record. However, the good faith of the transfer and conveyance by Ray to Noblett is not questioned. The consideration for the conveyance by Ray to Noblett appears from the deposition of J. B. Noblett, wherein he was asked "how much did you pay Mr. Ray for the business," and he replied "I gave him a house and lot in Shelbyville that I valued at $5000,—that was the cost of it to me, had depreciated some, would not have sold for that, and paid him dollar for dollar for this stock."

The "stock" mentioned in the above quoted answer of J. B. Noblett was the stock of gasoline, oils, and automobile accessories which Ray had on hand at the Tullahoma station when he sold same to Noblett.

The property leased by Doak Aydelott to the People's Service Stations, Incorporated, and which the complainants designate as the "wholesale station" or "wholesale plant" (which designation we will adopt as a means of distinguishing it from the service station about three-fourths of a mile distant therefrom) was leased by J. B. Noblett to the Gulf Refining Company on January 15, 1924. The answer of J. B. and H. L. Noblett contains certain averments (which are sustained by the undisputed testimony of J. B. Noblett and the exhibits thereto) relating to said last mentioned lease and also relating to an agency contract between the Gulf Refining Company and J. B. Noblett, which averments are as follows:

"Responding to matters set out in section 11 of said bill, defendants further answering say that on January 15, 1924, the Gulf Refining Company of Louisiana, made and entered into a lease or rental contract with the defendant J. B. Noblett, under the terms of which said Gulf Refining Company of Louisiana was to pay the said J. B. Noblett rental, payable monthly, at the rate of $25 per month, for a period of one year from January 15, 1924, and ending January 15, 1925, renewable at the option of the said Gulf Refining Company of Louisiana, for an additional two years at the same rental per month, and under the same conditions, the property described in the written

agreement between said parties, J. B. Noblett and the Gulf Re-
fining Company of Louisiana, which lease contract is exhibit
No. '3' to this answer, which is here referred to for its contents
in full. The property thus leased being one ware-house twenty-
four feet by thirty-six feet; two petroleum storage tanks, with
all pipes, valves and connections; also one gas engine for pump-
ing oil from tank cars into said storage tanks, said property
being situated on the corner of Anderson street, and the Mc-
Minnville and Sparta Branch of the railway, fronting fifty feet
on the railway, and one hundred feet on Anderson street, being
a parallelogram fifty by one hundred feet, located in Tulla-
homa, Tennessee.

"Under the terms of said contract allowing the same as here-
tofore stated, at the end of one year the said defendant Gulf
Refining Company of Louisiana, exercising their said option
rented or leased the said property from said J. B. Noblett for
a further term of two years at the said rental price, and been
paying said rent since that time to said J. B. Noblett and is
now still in possession of said property under said written con-
tract exhibit No. 3.

"On the 15th day of January 1925, the said Gulf Refining
Company of Louisiana, party of the second part in said con-
tract, exhibit No. 3 to this answer, entered into another con-
tract with the said defendant J. B. Noblett, party of the first
part, in which it was agreed among other things that said Nob-
lett was to operate as the agent and salesman of said Gulf Re-
fining Company at the storage tanks, and to sell at wholesale,
gasoline, oils etc., and other articles used in the operation of au-
tomobiles, etc.

"Said last mentioned contract is herewith filed as exhibit
No. 4 and made a part of this answer and is here referred to
for its contents in full.

"Soon after the defendant J. B. Noblett went into possession
of said property upon his purchase from said defendant Ed
Ray, that is his and his co-defendant H. L. Noblett's purchase,
the said J. B. Noblett began the erection of and did erect cer-
tain improvements consisting of a warehouse etc., at a cost of
the full sum of $1500, said improvements being made on the lot
leased from Aydelott, near the said storage tank or tanks, and
constructed to be used in connection with the said business,
that is to say with said wholesale business conducted by de-
fendants J. B. Noblett and the Gulf Refining Company. The
said $1500 was paid, by the said defendant J. B. Noblett, out
of his own funds and money."

The main office and place of business of the Diamond Oil Company was at Memphis, Tennessee, and it was a solvent, going concern at the time of its transactions with defendant Jetton before mentioned, and it continued to be a going concern until it was "wound up" pursuant to "receivership" proceedings had in the Federal Court at Memphis under a bill filed in the month of June 1924 by certain of its "minority stockholders," and its assets paid ninety-five per cent of its indebtedness.

Whether the People's Service Stations, Incorporated, had completed the installation of its retail service station at Tullahoma before its merger with the Diamond Oil Company is not quite clear on the record, but we infer that it had not. In the Spring of 1921, the Diamond Oil Company built storage tanks at the "wholesale station" in Tullahoma, and thereafter, until it sold its Tullahoma properties and business to defendant Jetton on May 13, 1922, as aforestated, it operated the retail service station and also a wholesale business in the sale of gasoline and oils, and paid into the Trader's National Bank at Tullahoma for the use and benefit of the holders of the aforesaid forty "participating operation certificates" held by the complainants and others, out of the proceeds of its daily sales, one and one-half cents on each gallon of gasoline sold, and five per cent of all other merchandise sold, from both the retail and wholesale stations.

Defendant Jetton and Ed Ray and J. B. Noblett & Son, in succession, also deposited in the Trader's National Bank, out of the proceeds of their daily sales from the service station, that is, the retail station at Tullahoma, one and one-half cents on each gallon of gasoline sold and five per cent of all other merchandise sold, but neither defendant Jetton nor Ed Ray conducted a wholesale business at Tullahoma, and the Nobletts did not sell at wholesale, except that J. B. Noblett conducted a wholesale business as agent for the Gulf Refining Company as before shown.

It is alleged in complainants' bill that "said James R. Jetton immediately after taking charge of said People's Service Station, Incorporated, at Tullahoma, Tennessee, refused and declined and did not set aside the one and one-half cents on all gasoline sold or five per cent on all the merchandise sold out of the wholesale or retail plants as had been done by the People's Service Station, Incorporated, and the Diamond Oil Company," but, as before stated, the undisputed proof shows that defendant Jetton did set aside and deposit in the Trader's National Bank for the benefit of the complainants and other certificate holders one and one-half cents on all gasoline sold and five per cent on all merchandise sold out of the retail station, and complainants are not now insisting otherwise.

But, without regard to the matter of setting aside the prescribed sums out of sales made at the retail station, it is alleged in complainants' bill that defendant Jetton had breached his contract in two particulars, viz: (1) in that he had failed and refused to operate the wholesale plant at Tullahoma, and (2) in that he had failed and refused to incorporate and organize the J. R. J. Oil Company; and it is averred in the bill that "when the said James R. Jetton first violated the contract in said participating certificates then and there the entire amount became due and at that time the said James R. Jetton became liable for the full amount of the participating certificates."

It is further averred in the bill that "all of these parties" (the defendants) "knew of these participating certificates and obligations, and that they knew that these plants were purchased and installed out of the funds derived from the sale of these participating receipts. They also charge that there is a lien against all of this property. They also charge that said certificates and indebtedness creates a lien against this property as to the People's Service Stations, Incorporated, and all of the subsequent purchasers who purchased same knowing of the certificates and this contract. They now charge that a lien (should) be declared on this property as it has never been operated since the conveyance by the Diamond Oil Company according to the contract of the People's Service Stations, and all these purchasers knew of this contract."

The complainants sought by their bill to have a receiver appointed to take charge of both the retail and wholesale plants at Tullahoma and to have same sold for the satisfaction of said certificates, and that complainants have a deficiency judgment against the defendants to the bill for any balance remaining unpaid on said certificates after the application thereto of the proceeds of the sale of the properties.

The Chancellor declined to appoint a receiver, and the propriety of his action in that respect is not now questioned.

Before final decree, the complainants entered into an agreement with the defendants Ed Ray, J. B. Noblett and H. L. Noblett which subjected both the retail and wholesale plants to sale for the benefit of the complainants and other holders of participating operation certificates, and which discharged said defendants Ray and the Nobletts from personal liability to the complainants. Said agreement was subsequently made a decree of the court, as follows:

"This cause came on to be heard on the 17th day of May, 1927, before the Honorable T. L. Stewart, Chancellor, holding the chancery court at Manchester, Tennessee, upon the bill of the complainant and the answers of J. R. Jetton, J. B. Noblett

and H. L. Noblett and Ed Ray, and the record in the cause, and upon an agreement of the complainants and defendants, J. B. and H. L. Noblett and Ed Ray, which agreement is made a decree of the court, to-wit: It is agreed that the Clerk and Master of this court sell the retail plant and the wholesale plant described in the pleadings, upon twenty days advertisement, for one-third cash, and the balance on six and twelve months time, the purchaser to execute bankable notes for the deferred purchase money. Said sale will be subject to the leases from Doak Aydelott to the People's Service Station, Incorporated, and E. I. Hitt and T. L. Huffman to the People's Service Station, Incorporated. Out of the proceeds of said sale the defendants J. B. and H. L. Noblett shall share in the ratio of the amount of money they have paid to certificate holders as the same bears to the value of the certificates that may be filed in this cause after said certicates are properly credited with all payments that have been heretofore made thereon by the People's Service Station, Incorporated, Diamond Oil Company, J. B. Jetton and Ed Ray. The amount paid by J. B. and H. L. Noblett is $3024.25. The wholesale station will be sold by the Clerk and Master with the right of J. B. Noblett to remove an oil tank and two garages at the wholesale station, and the right to remove all movable fixtures or property that they may have placed at either station, which is as follows:

"At Retail Plant: One small garage metal sides and roof; two gasoline pumps; two underground tanks (each 350 gallon); two oil containers (movable); stock consisting of tires, tubes, etc., 1 safe, 1 cash register, two grease pumps. At Wholesale Plant: 1 warehouse about twenty by forty feet, 1 storage tank, 16,000 gallon, two garages, one motor, one gasoline pump.

"It is therefore ordered, adjudged and decreed by the court:

"1st—That the Traders National Bank turn over to the Clerk and Master all funds in its hands deposited with it to be paid to said certificate holders.

"2nd—That the Clerk and Master see that out of said funds all sums due E. I. Hitt and T. L. Huffman for the monthly payments on the lease from said Hitt and Huffman to the Peoples Service Station, Incorporated which lease was assumed by defendants J. B. and H. L. Noblett, are paid, and that any sums due Doak Aydelott on the lease from said Aydelott to Peoples Service Station, Incorporated, are paid. The lease from Hitt and Huffman to the Peoples Service Station, (Incorporated), is of record in Trust Book No. 26, page 339, register's office,

Manchester, Tennessee, and the lease from Doak Aydelott to Peoples Service Station, Incorporated, in Trust Book No. 26, page 324, register's office, Manchester, Tennessee.

"3rd—The said plants will be sold separately, that is the Clerk and Master will sell the retail plant on the following terms: One-third cash, balance due six and twelve months. He, will then sell the wholesale plant on the same terms, but with the right announced at the sale and in the advertisements, of the defendants H. L. and J. B. Noblett to remove permanent fixtures that they have placed on the lot. Said sale will be made and advertisements, subject to the leases heretofore described and the purchaser shall become the owner of all the optional right set out in each of said leases, with a full right to exercise said options set out in each lease as the same is expressed and stipulated in each particular lease.

"4th—The Clerk and Master will before advertising the property for sale insert a notice in the Tullahoma Guardian, requiring all holders of said certificates issued by the Peoples Service Station, Incorporated, at Tullahoma, or for the Tullahoma plants, to be filed with him within ten days from the date of said notice. At the expiration of said ten days the Clerk and Master will advertise the sale of the said wholesale and retail stations by advertising in the Tullahoma Guardian for twenty days. Said sale will be held in front of the City Hall at Tullahoma, Tennessee, between the hours of ten o'clock, a. m., and four o'clock p. m., but the Clerk and Master shall set the hour of sale in his advertisement.

"5th—Out of the proceeds of said sale when made all the costs incident to this branch of this suit shall be paid and the Clerk and Master will pay to A. L. Davidson and J. W. Rankin a reasonable attorney's fee, the same to be allowed by the court upon application. Out of the residue the defendants J. B. Noblett and H. L. Noblett shall be paid their pro rata based upon the ratio of the sum of $3024.25, to the value of the certificates filed with the Clerk and Master. That all funds accruing to the defendants J. B. and H. L. Noblett in this branch of the case, shall be paid to their solicitors of record, Finley, Ewell & Ewell, of Manchester, Tennessee, and said attorneys are hereby given a lien on said funds for their reasonable fee.

"The Clerk and Master will report his action in the premises after the sale, and until the incoming of said report all other matters are expressly reserved. The right of the removal of the permanent fixtures placed at the wholesale and retail plants by J. B. and H. L. Noblett, as heretofore set out is granted

them, but should they desire the same may be left on the leased property at each plant and be sold by the Clerk and Master, but an agreement shall be made as to the sale price of said permanent improvements if the same are sold in the sale by the Clerk and Master. However, if the said Nobletts desire they may remove the same before said sale and not permit a sale of them to be made. But no sale of the plants under this decree shall be confirmed except by consent of the complainants.

"That the cause be dismissed as to defendant Ed Ray."

The order of the Chancellor directing the entry of the aforesaid agreed decree and the pronouncement of the decree dismissing the bill as against defendants Jetton and Gulf Refining Company were cotemporaneous. The complainants having appealed from the decree dismissing their bill against defendants Jetton and Gulf Refining Company and brought the record to this court at that stage of the cause, it does not appear what, if any, steps have been taken toward the execution of the "agreed decree" ordering a sale of the retail service station and wholesale plant at Tullahoma. There was no adjudication and determination in the court below of the amounts due the complainants as the holders of participating operation certificates, after crediting the sums paid into the Trader's National Bank for their use and benefit by the Diamond Oil Company, Jetton, Ray and Noblett. There is no proof of the value of the properties which the Clerk and Master was, by the "agreed decree" ordered to sell. If it should be held that defendant Jetton breached his contract, and that complainants have a right of action against him for the breach, it seems obvious that the measure of their recovery could be no more than the sums necessary to mature the participating operation certificates, after crediting thereon the sums heretofore paid by the Diamond Oil Company, Jetton, Ray and the Nobletts, and the proceeds of the property to be sold under the agreed decree; and, for aught that appears in the record, these sums might be sufficient to satisfy the certificates. We do not mean to say that there is any evidence in the record that these sums would be sufficient for that purpose, but merely that there is an absence of evidence that they would not be.

The state of the record, as we have just described it, has suggested to the court the query as to whether the appeal in this case may not be premature, that is, as to whether the decree appealed from is a final decree from which an appeal would lie. We have not found it easy to answer this question, but we have decided that the appeal should be entertained. We shall not enter, in this written opinion, upon a discussion of the question, but will content ourselves with the above statement of our conclusion on that point.

Through their first assignment of error the complainants assert that the Chancellor erred in holding that defendant Jetton was not liable to complainants, and in dismissing complainants' bill against defendant Jetton.

One of the theories on which complainants are seeking to hold defendant Jetton liable as the obligor in the participating operation certificates is that he not only took the property at Tullahoma, conveyed to him by the Diamond Oil Company, subject to the obligations of said certificates, but that he personally assumed the obligations of the Diamond Oil Company as expressed in said certificates.

The property has been subjected to the claims of complainants by the decree entered pursuant to the agreement between complainants and defendants Ray and the Nobletts, and therefore complainants are not in a position to complain on the ground that defendant Jetton took said properties "subject to the contractual obligations of the said Diamond Oil Company as expressed in said certificates."

In order to charge the grantee with a personal liability for encumbrances on property conveyed, an intent on the part of the grantee to assume the indebtedness must clearly appear.

The rules governing the liability of one who purchases mortgaged property and accepts a conveyance thereof from the mortgagor are set forth in 3 Pomeroy's Eq. Juris., 4th Ed., sections 1205, 1206 and 1207, which read as follows:

"1205. I. Conveyance by the Mortgagor Subject to the Mortgage. The mortgagor can convey the entire mortgaged premises to a single grantee; or he can convey them in parcels to different grantees simultaneously or successively; or he can convey a portion and retain the residue. Where the mortgagor conveys by a deed absolutely silent with respect to an outstanding mortgage, the grantee, of course, takes the land encumbered by the mortgage, if he has actual notice of it, or constructive notice by record or otherwise. Where a mortgagor conveys by a deed which states simply that the conveyance is 'subject to' a certain specified mortgage, or words to that effect, the grantee takes the land burdened with the lien. As between himself and the grantor-mortgagor, the land is the primary fund out of which the mortgage debt should be paid; he cannot thus exonerate the land. He does not, however, become personally liable for the mortgage debt, but the mortgagor remains personally liable for any deficiency arising upon a foreclosure sale of the land. A grantee who thus takes a conveyance subject to a mortgage is presumed to have included the mortgage debt in the purchase price, and is not, therefore,

permitted to dispute the validity of the mortgage; in this respect he is in the same position as one who expressly assumes the mortgage.

"1206. The Same. Grantee Assumes the Mortgage. The mortgagor may not only convey the premises 'subject to' the mortgage; he may also convey them in such a manner that the grantee assumes the payment of the mortgage debt, and thus renders himself personally liable therefor. The element which lies at the bottom of such assumption and which alone gives it efficacy according to the theory held by some courts, is the fact that the mortgage debt is included in the purchase price as a constituent part thereof, and the grantee actually pays or secures to his grantor only the balance of the gross price after deducting such debt. No particular form of words is necessary to create a binding assumption; it is sufficient that the language shows unequivocally an intent on the part of the grantee to assume the liability of paying the mortgage debt, but this intent must clearly appear. When the deed executed by the grantor contains a clause sufficiently showing such an intent, the acceptance thereof by the grantee consummates the assumption and creates a personal liability on his part, which inures to the benefit of the mortgagee as though he had himself executed the deed. When a grantee thus assumes payment of the mortgage debt as a part of the purchase price, the land in his hands is not only made the primary fund for payment of the debt, but himself becomes personally liable therefor to the mortgagee or other holder of the mortgage. The assumption produces its most important effect, by the operation of equitable principles, upon the relations subsisting between the mortgagor, the grantee, and the mortgagee. As between the mortgagor and the grantee, the grantee becomes the principal debtor primarily liable for the debt, and the mortgagor becomes a surety, with all the consequences flowing from the relation of suretyship. As between these two and the mortgagee, although he may treat them both as debtors and may enforce the liability against either, still, after receiving notice of the assumption, he is bound to recognize the condition of suretyship, and to respect the rights of the surety in all of his subsequent dealings with them. Payment, therefore, by a granteee who has assumed the entire mortgage debt completely extinguishes the mortgage; he cannot be subrogated to the rights of the mortgagee, and keep the mortgage alive for any purpose, while the mortgagee may release the mortgagor without discharging the grantee, his release of the grantee, or his valid extension of the time of payment to the grantee, without the

mortgagor's consent, would operate to discharge the mortgagor. In short the doctrines concerning suretyship must control the dealings between these three parties. When land is thus conveyed, with an assumption of a mortgage by the grantee contained in the deed, subsequent grantees holding under the conveyance are charged with notice, and the land continues to be the primary fund for payment, as though the fact were recited in their own deeds. In the foregoing statement of the general doctrine, it has been supposed that the grantee assumes payment of the whole mortgage. If a grantee, in purchasing a part of the mortgaged premises, assumes payment of a part of the mortgage, he becomes personally and primarily liable only for such part. The general doctrine is well settled that a grantee who thus assumes payment, in whole or in part, of a mortgage as a portion of the purchase price of the land conveyed to him cannot contest the validity of the mortgage on any ground and thus evade the liability which he has assumed.

"1207. Rationale of the Grantee's Liability. The ground of the grantee's liability adopted by the courts of a large majority of the states is that of contract. It is an application of the general doctrine, so widely prevailing in this country that it may properly be called an American doctrine,—where A makes a promise directly to B, for the benefit of C, upon a consideration moving alone from B, C, being the party beneficially interested, may treat the promise as though made to himself, and may maintain an action at law upon it in his own name against A, the promisor. According to this generally accepted view, the liability of the grantee who thus assumes the payment of the outstanding mortgage does not depend upon any extension of the equitable doctrine concerning subrogation; it is strictly legal, arising out of a contract binding at law; the mortgagee, instead of enforcing the liability by a suit in equity for a foreclosure, may maintain an action at law against the grantee upon his promise, and recover a personal judgment for the whole mortgage debt. Another and entirely different rationale is adopted by the courts of certain states; that the liability of the grantee to the mortgagee does not arise from contract, and does not exist at law; but it results from an application, or more correctly an extension, of the equitable doctrine of subrogation. Since the mortgagor becomes a surety, the creditor is entitled by subrogation to all the securities which he holds from the principal debtor, and is thus entitled in equity to enforce the promise made to him by the grantee. According

662

to the general theory first above stated, the grantee's assumption and promise are so completely for the benefit of the mortgagee that the grantor can maintain no action thereon merely because the grantee has failed to perform his undertaking; it is only where the grantor has himself paid the mortgage that he becomes subrogated to the rights of the mortgagee, and is entitled to enforce it against the grantee.''

The holdings in Tennessee are in accord with the rules stated by Professor Pomeroy in the sections above quoted. Snyder v. Summers, 1 Lea, 534; Knox v. McCain, 13 Lea, 197; O'Conner, Admx., v. O'Conner, 88 Tenn., 76, 12 S. W. 447; Sully v. Childress, 106 Tenn., 109, 60 S. W., 499; Lieberman v. Bowden, 121 Tenn., 496, 119 S. W., 64; Merrimon v. Parkey, 136 Tenn., 645, 191 S. W., 327; Title Guaranty & Trust Co. v. Bushnell, 143 Tenn., 681, 228 S. W., 699, 12 A. L. R. 1528.

The participating operation certificates were not, by their terms, an express lien on the Tullahoma property of the People's Service Stations, Incorporated, (or its successor, by merger, the Diamond Oil Company) and certainly a purchaser of the property, ''subject to the obligations'' of the certificates will not be held to a stricter liability than a purchaser of mortgaged property ''subject to'' the mortgage.

In O'Conner, Admx., v. O'Conner, supra, (at page 81), the court, speaking through Judge Lurton, quoted with approval section 1206 of Pomeroy's Eq. Juris, supra, including the statement that ''it is sufficient that the language shows unequivocally an intent on the part of the grantee to assume the liability of paying the mortgage debt; but this intent must clearly appear.''

Manifestly there was no ''intent'' on the part of defendant Jetton to assume any personal liability for ''the contractual obligations of the Diamond Oil Company as expressed in said certificates,'' for it is expressly provided in the conveyance that ''he (Jetton) does not personally or individually assume said obligations.''

Complainants are also insisting that the Chancellor should have granted them a judgment against defendant Jetton on the theory that he breached his contract (made with the Diamond Oil Company) to organize a corporation ''to be known as the J. R. J. Oil Company,'' which would ''assume the obligations of said Diamond Oil Company with reference to said certificates.''

It is, to say the least, doubtful whether the bill contains any averments which could be construed as seeking a recovery upon this latter ground. The only averments of the bill on this subject (except the bare recital of the terms of the conveyance by the Diamond Oil Company to Jetton) are as follows:

"Your complainants would further charge that while the said J. R. Jetton undertook in the conveyance made to him from the Diamond Oil Company to organize a J. R. Jetton Oil Company, and he agreed that that would assume these obligations, but after he failed to organize this company he ran a J. R. Jetton Oil Company, and ran it individually, and thereby became responsible for these certificates. Said Jetton had the Peoples Service Station to give him a quit-claim deed in May, 1922, after he had taken charge and run the station. He operated the same under all agreements and assumed all liabilities, therefore he is liable."

But, passing the matter of pleading, it appears, as before stated more in detail, that, upon the payment to it of $5500, the Diamond Oil Company released defendant Jetton from his agreement to organize the J. R. J. Oil Company and agreed that he might sell the Tullahoma properties. Upon this subject the learned Chancellor, in his findings and opinion, said:

"I am of opinion that the Diamond Oil Co. had authority to release him from organizing JRJ Oil Co. It was owner of property conveyed. It was a going concern and solvent at time of sale and release, and for some time thereafter. It received consideration for such release out of the sale of the property it had conveyed to Jetton. It imparted title to him. It imposed terms by contract of sale, and I think had authority to change terms of sale, accept payment and release the purchaser from obligation—certainly, the certificate holders could stand on no higher ground than holders of preferred stock in a corporation, and I am of opinion that in such a case they could not recover of a vendee under such facts and circumstances.

"The equities of the cause are with defendants, I think, besides the delay of complainants should bar them I think more especially since the Diamond Oil Company has become insolvent and its corporate affairs wound up."

The conclusion of the Chancellor as above stated is reinforced by other record facts. The record shows that complainants were hostile to defendant Jetton when the latter took over the property in question at Tullahoma, and prior to the time the Diamond Oil Company agreed to release the defendant Jetton from his agreement to organize the J. R. J. Oil Company complainants had not indicated a purpose to accept him as the obligor in the participating operation certificates, or to assert any rights against him thereunder. It is well settled by the great weight of authority that a contract between a mortgagor and his grantee, whereby the latter assumes and agrees to pay the mortgage debt, may be rescinded at any time be-

fore the mortgagee has accepted the agreement or asserted his rights thereunder. See cases digested in Annotation, 21 A. L. R., page 452 et seq.

Moreover, Ed Ray, the vendee and grantee of defendant Jetton, "fully assumed" the obligations of the People's Service Stations, Incorporated, under the participating operation certificates. In such case, the grantee who assumes an obligation is bound, although the grantor is not personally liable thereon. Title Guaranty & Trust Co. v. Bushnell, supra, page 691; Cockrell v. Poe (Wash.), 12 A. L. R. 1524, and Annotation, page 1528.

There is no evidence in the record that Ed Ray was insolvent. He was sued as a citizen of the State of Florida, but when his deposition was taken during the pendency of the case in the chancery court, he was a citizen of Tullahoma, Tennessee, and engaged in the automobile business at that place. If Ed Ray was solvent (and, in the absence of evidence to the contrary, it will be presumed that he was), complainants suffered no injury or damage by the fact that defendant Jetton conveyed the property to Ed Ray instead of organizing a corporation and conveying the property to it.

For the reasons stated, the complainants' first assignment of error is overruled.

The second assignment of complainants is that "the court erred in holding that the defendant James R. Jetton sold the Tullahoma stations by the consent of the Diamond Oil Company." The finding of the Chancellor thus challenged is amply supported by the evidence, and this assignment is overruled.

The third assignment of complainants is that "the court further erred in holding and finding the facts that the sale of the Tullahoma plants was made after Jetton was released by the Diamond Oil Company of the organization of the J. R. J. Oil Company." The finding of the Chancellor on this point is that within a few months after defendant Jetton bought the stations at Tullahoma, Shelbyville, Lewisburg and Lebanon, he "sold three of the stations purchased, including the station at Tullahoma, by the consent and agreement with the Diamond Oil Company, his vendor."

The proof shows that defendant Jetton sold the "Tullahoma plants" with the consent of the Diamond Oil Company, and after an agreement had been reached that the Diamond Oil Company would release Jetton from his contract to organize the J. R. J. Oil Company. The formal release by the Diamond Oil Company, hereinbefore copied, was not executed until after Jetton sold the Tullahoma plants, but it merely confirmed the agreement which had been made before the sale by Jetton to Ray. The third assignment is overruled.

The fourth, seventh, eighth, ninth and tenth assignments of complainants are merely subsidiary to and involved in the assignments previously disposed of herein, and these assignments are overruled.

The fifth assignment of complainants is that "the court committed further error in holding that complainants had knowledge of the sale from Jetton to Ed Ray." We think it is a reasonable inference from the record that complainants "had knowledge of the sale from Jetton to Ed Ray" shortly after that sale was made. The fifth assignment is overruled.

The sixth assignment of complainants is that "the court further erred in holding that the defendant James R. Jetton had a meeting with complainants before he purchased from the Diamond Oil Company." The Chancellor found that "it appears that defendant Jetton had at least two meetings with the certificate holders, one before and one after the release by Diamond Oil Company;" but the Chancellor did not find, so far as we have been able to ascertain, that defendant Jetton had a meeting with complainants before he purchased from the Diamond Oil Company.

The complainants' eleventh (and last) assignment is that "the court erred further in holding that because it was not profitable for Jetton to operate the wholesale plant at Tullahoma it was not a breach of the contract provided in the certificates and that Jetton was released from any liability or damages by failing to operate said wholesale station."

The proof tends to show that the operation of a wholesale business in gasoline and oils at Tullahoma in the year of 1922 would have been unprofitable, and would have resulted in a loss to the operator. However, as we have held, irrespective of this fact, that the complainants have not established a right to a recovery against defendant Jetton, the eleventh assignment is overruled because it tenders an immaterial issue.

This disposes of all of the complainant's assignments of error.

Defendant Jetton, as appellant, has presented an assignment of error as follows:

"The Chancellor erred in overruling the motion of this defendant, James R. Jetton, to dismiss complainants' bill on the ground of multifariousness, lack of jurisdiction of the person of the defendant, and also of misjoinder of parties, in that, the said defendant was a resident of Rutherford county, Tennessee, as shown by the bill and the subpoena to answer. And because the bill was multifarious, seeking to sue the defendants on distinct and separate causes of action in the same bill, and because of misjoinder of parties."

The complainants' bill was filed in Coffee county, and process was there served upon the resident defendants (J. B. Noblett and

H. L. Noblett, and J. B. Noblett as agent of the Gulf Refining Company), and a counterpart summons was issued to Rutherford county for defendant Jetton, and was there served upon him.

"The common law was exceedingly averse to permitting defendants to be sued, even in transitory actions, other than at the place where they resided." Carlisle v. Cowan, 85 Tenn., 165, 169, 2 S. W., 26.

But under our statutes, the chancery court has jurisdiction (in transitory actions) "wherever the defendant, or any material defendant, is found." Shan. Code, sec. 6115. And counterpart summons may be issued to any other county in the State for defendants not to be found in the county where the suit is brought. Shan. Code, sec. 6116.

"The purpose of the Act (Shan. Code, 6115-6116, supra) . . . was to save multiplicity of suits by bringing all the parties into the county where one of the material defendants resides." Achy v. Holland, 8 Lea 510, 511.

We are of the opinion that defendants J. B. Noblett and H. L. Noblett were "material defendants." Simonton v. Porter, 1 Baxt. 213, 215; Roper v. Roper, 3 Tenn. Chy., 53, 55; Hatcher v. Royster, 14 Lea 222, 226; Craig v. McKnight, 108 Tenn., 690, 692, 69 S. W., 322; Frankfort Land Co. v. Hughett, 137 Tenn., 32, 43, 191 S. W., 530.

Hence, the chancery court of Coffee county had jurisdiction, and defendant Jetton could be brought in by counterpart summons, unless the bill was multifarious, in that, it sought a recovery against defendant Jetton upon an alleged cause of action wholly separate and distinct from the cause or causes of action against the defendants residing in Coffee county.

We have carefully considered the forceful argument of counsel for defendant Jetton, and the authorities cited, in support of the proposition that the bill is multifarious, but we have reached the conclusion that the matters involved in this suit so far "spring from a common root" and have so many "connecting ligaments" (Gibson, sec. 284), that the Chancellor did not abuse his discretion in declining to dismiss the bill on the ground of multifariousness.

"Multifariousness as to parties is quite generally recognized as incapable of exact definition, its application depending upon the facts of the particular case, and resting largely in the discretion of the court. It appears to be a rule of convenience, properly invoked to avoid confusion, complications, expense, or delay, and consequent injustice—provided, that parties brought before the court in one suit have, generally speaking, an interest, direct or indirect, in the subject-matter

of the litigation and the relief sought.'' Rose v. Morrow, 153 Tenn., 97, 101, 282 S. W., 379.

A judgment of dismissal on the ground that the bill is multifarious is not on the merits, and separate suits may be thereafter brought against the defendants. Jefferson v. Gaines, 7 Baxt. 368, 372; Deaderick v. Wilson, 8 Baxt., 108, 140; Ohio Life Insurance Co. v. Merchants Insurance Co., 11 Hump., 1, 37.

''No good purpose could now be answered by sending this cause back and having separate bills filed.'' Bartee v. Tompkins, 4 Sneed, 623, 637. Defendant Jetton's assignment of error is overruled.

All of the assignments of error having been overruled, it results that the decree of the chancery court dismissing complainants' bill against defendants Jetton and Gulf Refining Company, at the cost of complainants, will be affirmed, and a decree will be entered accordingly. The costs of the appeal will be adjudged against the complainants and the surety on their appeal bond.

Crownover and DeWitt, JJ., concur.